UNITED STATES of America, Appellant,

v.

Dominick MENNUTI and Victor Natale, Appellees.

No. 437, Docket 80–1174.

United States Court of Appeals, Second Circuit.

Argued Nov. 5, 1980.

Decided Jan. 9, 1981.

Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y. (Harvey M. Stone and Arlene R. Lindsay, Asst. U. S. Attys., Brooklyn, N. Y., of counsel), for appellant.

Irwin Popkin, Tepper & Popkin, Hicksville, N. Y., for appellee Mennuti.

Before FEINBERG, Chief Judge, and FRIENDLY and MESKILL, Circuit Judges.

FRIENDLY, Circuit Judge:

The United States appeals from an order of the District Court for the Eastern District of New York dismissing an indictment under § 844(i) of Title XI of the Organized Crime Control Act of 1970 on the ground that the Government's proposed proof would not establish a crime within the terms of the statute.

A four count indictment charged appellees Mennuti and Natale and others who subsequently pleaded guilty with conspiracy to violate and substantively violating 18 U.S.C. § 844(i) by destroying two buildings located at 10 Yacht St., Brookhaven, N.Y., and 26 Sally Lane, Ridge, N.Y. by means of explosives. The pertinent statute, enacted in 1970, as a part of the Organized Crime Control Act, imposes heavy penalties on anyone who

> maliciously damages or destroys, or attempts to destroy, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce
>
> . . . .

Mennuti and Natale having moved to dismiss the indictment for lack of jurisdiction, the Government submitted an affidavit of an Assistant United States Attorney, reproduced in the margin,[1] stating the facts on

---

1. STEVEN G. NELSON deposes and says:

1. I am an Assistant United States Attorney in the Office of EDWARD R. KORMAN, United States Attorney for the Eastern District of New York, and I am fully familiar with the facts and circumstances relating to this matter. This Affidavit and an accompanying memorandum of law are submitted in opposition to defendant Mennuti's motion to dismiss the indictment herein.

2. Defendant Mennuti claims that the indictment should be dismissed because: 1) the properties alleged to have been destroyed were not "used in interstate or foreign commerce" or in "any activity affecting interstate or foreign commerce" as alleged in the indictment; and 2) that the two premises involved were not destroyed by means of an "explosive" as that term is defined in Title 18, United States Code, Section 844(i) and (j).

3. Counts One and Two of the indictment charge the defendants Mennuti, Cruser and Natale with conspiring to destroy, and actually destroying, a building located at 10 Yacht Street, Brookhaven, New York by means of an explosive. 10 Yacht Street, Brookhaven, was a one-family dwelling owned by Dominick Mennuti's wife, Anne

Mennuti. During the period in question the dwelling was the actual residence of the Mennuti family. The mortgage financing the purchase of the house was held by the Union Savings Bank of Long Island, which conducted business in interstate commerce and whose business affected interstate commerce.

4. The premises at 10 Yacht Street was insured by the Government Employees Insurance Company (GEICO) and approximately Twenty-Five Thousand ($25,000) Dollars was paid to Anne Mennuti by GEICO in settlement of the insurance claim for the fire at 10 Yacht Street. The payments were made in the form of several checks which were drawn on out-of-state banks. Presumably, the mortgage holder, the Union Savings Bank of Long Island, was paid out of the proceeds of the insurance claim.

5. As noted in oral argument before the Court, the residence at 10 Yacht Street was constructed with various components and materials, e. g. wood, glass and asphalt shingles, which are produced exclusively outside of New York State. Likewise, telephone lines, electric lines and other services provid-

which it would rely as showing that defendants' alleged acts were within the statute. In a well-considered opinion Judge Pratt held that these facts did not suffice to show that destruction of two private residences by means of an explosive constituted the destruction of a building "used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." Accordingly he dismissed the indictment. The Government has appealed pursuant to 18 U.S.C. § 3731.

To the ordinary mind, the destruction of two private dwellings would not constitute the destruction of buildings *used* in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. The pictures summoned up by these words include such things as railroad stations, bus depots, airport buildings, and factories using raw materials from out of state or shipping products out of the state, *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Crossing the area between use in commerce and use affecting commerce, we reach such buildings as the offices of an insurance company receiving premiums from outside the state and disbursing benefits and loans across state lines, *Polish National Alliance v. NLRB*, 322 U.S. 643, 647–48, 64 S.Ct. 1196, 1198, 88 L.Ed. 1509 (1944), or of a company delivering within the state oil purchased from another company that had brought it into the state, *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226–27, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963), or hotels and restaurants serving imported food to persons traveling from one state to another. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964).

█ It is abundantly clear, as the above cases illustrate, that only business-related

---

ed at 10 Yacht Street traveled in interstate commerce and affected interstate commerce. Finally, of course, when the residence at 10 Yacht Street was destroyed, it was rebuilt, again through the use of building materials originating outside of New York State.

6. *Counts Three and Four* charge all five defendants with conspiring to destroy, and actually destroying, a building located at 26 Sally Lane, Ridge, New York. The building in question was a rental property owned by defendants Roy and Tricoli for rental to the public. Those defendants advertised the property as a rental in a newspaper which traveled in interstate commerce, i. e. Newsday. The building was originally constructed of building materials originating outside of New York State, and after being repeatedly vandalized, was repaired with other materials coming from out of state. Likewise, utilities traveling in and affecting interstate commerce serviced the building at 26 Sally Lane. Finally, and most significantly, the insurance proceeds for the claim relating to the destruction of 26 Sally Lane were paid by checks drawn on an out-of-state bank account in the name of Continental Casualty Insurance Company.

7. With regard to the claim that these buildings were destroyed by an "explosive" within the definition of Title 18, United States Code, Section 844(i) and (j), the Government will establish at trial that the building at 10 Yacht Street was destroyed through the use of five to seven gallons of a mixture of paint thinners and gasoline. The building at 26 Sally Lane was destroyed through the use of five gallons of gasoline. In each case the flammable liquid was poured in several rooms before matches were thrown to ignite the liquid. In the case of the fire at 26 Sally Lane, the Government will establish that the explosion was so violent that the torch man, Edward Cruser, was blown out of the rear door of the building.

8. In addition, the Government will prove through the testimony of explosives experts and expert fire marshals and investigators that gasoline, when exposed to the air and ignited by fire, is an "explosive" within the meaning of Title 18, United States Code, Section 844(i) and (j). Similarly, they will testify that a combination of paint thinners and gasoline, when exposed to the air and ignited by fire, is an "explosive" as defined in the aforementioned subsections.

9. Based on the foregoing, the government submits that the counts in the indictment herein state causes of action over which the Court has jurisdiction. The properties in question were used in interstate commerce and in an activity affecting interstate commerce and they were each destroyed by means of an explosive.

WHEREFORE, we respectfully pray that defendant Mennuti's motion be, in all respects, denied.

Although the affidavit characterizes 26 Sally Lane simply as "a building", there is no dispute that it, like 10 Yacht St., was a single family residence.

activities constitute "commerce". Chief Justice Marshall instructed long ago that the essence of commerce is "commercial intercourse". *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), a definition consonant with the dictionary and with the derivation of the term. Consequently a residence is not used in interstate or foreign commerce simply because it was built in part with out-of-state materials, its purchase was financed by a bank which engages in or whose activities affect interstate commerce, it was insured by a company engaged in such commerce, it received electric power and telephone service from companies engaged in or affecting commerce, and its repair or reconstruction will require out-of-state materials. This would not be changed by the fact that a dwelling was advertised for rental, and that a lessee might come from without the state.

It would be altogether strained to say that such a dwelling, although not used in commerce, is "used" in an activity affecting commerce. It is not enough under the statute that the quantum of commerce might differ if the dwelling had never been built, were destroyed or were rebuilt. The critical word here is "used". Congress did not define the crime described in § 844(i) as the explosion of a building whose damage or destruction might affect interstate commerce as we assume it could constitutionally have done. See generally Stern, The Commerce Clause Revisited—The Federalization of Intra-State Crime, 15 Ariz.L.Rev. 271 (1973). It chose to require that the damaged or destroyed property must itself have been used in commerce or in an activity affecting commerce.

*Heart of Atlanta Motel, Inc. v. United States, supra,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 and *Katzenbach v. McClung, supra,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290, do not run counter to this analysis. Title II of the Civil Rights Act of 1964, which was at issue in those cases, dealt with a variety of business enterprises—hotels, restaurants, motion picture houses and the like, see 42 U.S.C. § 2000a *et seq.* Congress declared that they were to be deemed to affect commerce if certain criteria with respect to interstate patronage or source of supply were met. Clearly the establishments were being used in the sale of goods and services, the very elements that are absent here.

The case before us likewise does not fall within the "third category" described in *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359, 28 L.Ed.2d 686 (1971).[2] There Congress followed the pattern of first declaring that all extortionate credit transactions, "even when purely intrastate in character, nevertheless directly affect interstate and foreign commerce", see 402 U.S. at 147 n.1, 91 S.Ct. at 1358, n.1 and then making it a crime to engage in such a transaction without need of proof that the specific transaction had any particularized effect on commerce. The statute with which we are here concerned follows a different scheme. The general declaration of purpose, 84 Stat. 952, was merely, so far as here pertinent, that the statute was "to protect interstate and foreign commerce against interference and interruption by reducing the hazard to persons and property arising from misuse and unsafe or insecure storage of explosive materials." Each of the crimes listed in the many subsections to §§ 842 and 844 had to meet the specific tests specified in each.

Finally, *Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), is in no way inconsistent with this analysis. At issue in that case was the constitutionality, not the construction, of federal acreage limitations as they applied to wheat grown for home consumption. The plaintiff, Filburn, claimed that the regulation went beyond Congress' power to regulate commerce. While Filburn was not a wheat farmer, the Court made it clear that Congress' power to regulate his production of wheat was

2. The Government conceded that the case does not fall within either of the first two *Perez* categories, which embrace misuse of the channels of interstate or foreign commerce and protection of the instrumentalities of or persons or things in commerce. See 402 U.S. at 150, 91 S.Ct. at 1359.

grounded, at least in part, on the fact that he was a potential entrant into that market. As the Court said:

> One of the primary purposes of the Act was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and if induced by rising prices tends to flow into the market and check price increases.

317 U.S. at 128, 63 S.Ct. at 90.

The Government seeks to plug the gap between the statutory requirement and its proposed evidence by resort to legislative history, notably the House Report, No. 91–1549, Organized Crime Control Act of 1970, *reprinted in* [1970] U.S.Code Cong. & Adm. News, p. 4007. The relevant portion of the report begins with an excursus on the evils of bombing and states that there is a consensus that existing federal and state sanctions and prohibitions are inadequate. The report proceeds to say that Title XI "combines the regulatory approach to the distribution of explosives with strengthened and expanded criminal prosecutions that apply to the intentional misuse of explosives," and that "[i]ts purpose is to protect interstate and foreign commerce against interference and interruption by reducing the hazards to persons and property arising from explosives misuse and unsafe or insecure storage." After referring to a provision, § 844(f), making it a crime to damage or destroy by explosives property owned, possessed or used by or leased to the United States and organizations receiving Federal financial assistance, the report states with respect to § 844(i):

Section 844(i) proscribes the malicious damaging or destroying, by means of an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. Attempts would also be covered. Since the term affecting [interstate or foreign] "commerce" represents "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause," *NLRB v. Reliance Fuel Corp.*, 371 U.S. 224, 83 S.Ct. 312, 226, 9 L.Ed.2d 279 (1963), this is a very broad provision covering substantially all business property. While this provision is broad, the committee believes that there is no question that it is a permissible exercise of Congress [sic] authority to regulate and to protect interstate and foreign commerce. Numerous other Federal statutes use similar language and have been constitutionally sustained in the courts. See, Labor Management Relations Act, 29 U.S.C. 141 *et seq.*; Labor Management Reporting and Disclosure Act, 29 U.S.C. 401 *et seq.*; Civil Rights Act of 1964 (equal employment opportunity provisions), 42 U.S.C. 2000 *et seq.*; Consumer Credit Protection Act (truth in lending provisions), 15 U.S.C. 1601, *et seq.* and (loan sharking provisions), 18 U.S.C. 891 *et seq.*

[1970] U.S.Code Cong. & Adm.News at 4046–4047.

Putting aside the serious question whether language in a committee report could ever expand the breadth of a criminal statute clear upon its face, this extract, rather than supporting the Government's view, contradicts it. The report could not be clearer than when it speaks of "business" property. That phrase refers directly to the type of conduct punished by the statute, namely, the damage or destruction by explosion of business property *used* in interstate or foreign commerce or in an activity affecting such commerce,[3] not to dwelling

---

**3.** Use of the term "affecting commerce" by Congress and the courts seems to have had a number of different purposes. One is to draw within federal regulation business activities concededly local in nature, the federal regulation of which is necessary to preserve the integrity of federal regulation of interstate or foreign commerce. The historic paradigm of this concept (although the words were not used in the statute) was the Shreveport Rate Cases, *Houston, East & West Ry. v. United States*, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914); a

houses which were not being used for any commercial purpose at all.

The decisions of other courts of appeals cited by the Government are generally consistent with this interpretation. *United States v. Sweet*, 548 F.2d 198, 200 (7 Cir.), cert. denied, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977), involved the efforts of a tavern owner "to eliminate his competition by dynamite". The court readily sustained application of § 844(i) primarily on the authority of *Katzenbach v. McClung, supra*. *United States v. Nashawaty*, 571 F.2d 71 (1 Cir. 1978), upheld application of § 844(i) to the explosion of a paint shop in Massachusetts which in its regular course of business received goods from the Polaroid Company that originated outside the state and which at the time of the blast contained items that were destined to be sold in interstate commerce. *United States v. Schwanke*, 598 F.2d 575 (10 Cir. 1979), concerned a building in Oklahoma one of the tenants of which was a cafe which purchased candy, gum and vegetables from Arkansas. The court sustained a conviction, largely on the authority of *Sweet*. However, in *United States v. Monholland*, 607 F.2d 1311 (10 Cir. 1979), the same court declined to accept the Government's invitation to apply § 844(i) to the destruction of a pick-up truck used by a state judge in traveling to and from work, although the judge dealt with problems related to interstate commerce and drove the truck over the United States highway system. Almost certainly the pick-up truck or parts of it had been manufactured outside the state, used fuel brought in from other states or foreign countries, and was insured by a company having interstate business. The court held that the movement of the truck was not commerce and had no effect on commerce, even if one were to assume that the judge's activities did. Judge Doyle commented that "there is no indication in the statute that Congress, although it intended to have the statute broadly constructed, intended that everybody and everything should be included." 607 F.2d at 1316. The one possible exception to the general approach which the other courts of appeals have taken is *United States v. Grossman*, 608 F.2d 534 (4 Cir. 1979). *Grossman* concerned a hydraulic excavator (a "backhoe") which had been manufactured in Iowa, sold and shipped to a Virginia equipment company, and then sold to a North Carolina construction company, the purchase being financed by a national lending institution. Upon the bankruptcy of the construction company, the guarantor of the loan acquired the backhoe, with refinancing by the same lender, and advertised it for sale to "anybody, anywhere" in a Tennessee trade newspaper. Relying on *Sweet, supra*, and *Schwanke, supra*, which plainly did not go so far, the court held the case to fall within § 844(i). While we are not certain that we agree with *Grossman*, at least the backhoe was business property which had been used in an activity affecting interstate commerce, was likely to be so used again, and was being currently advertised for a sale that could result in the backhoe's crossing state lines.

Whereas the Government's brief in the district court had relied on such facts as the out-of-state origin of the materials that had been used in the houses and would be required for repair or replacement, the financing and insurance of the houses, and the furnishing of electric power to them, in brief and argument in this court it also

more recent instance is *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). Closely related to this are the cases, of which the prime example is *NLRB v. Jones & Laughlin Steel Corp., supra*, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, sustaining application of § 10 of the National Labor Relations Act, which empowers the NLRB to prevent any person from engaging in any unfair labor practice "affecting commerce", a term defined in § 2(7), to a local activity, e. g., picketing or strikes, that would burden or obstruct industry engaged in interstate or foreign commerce. A third is to enlarge the category of businesses brought under the relevant federal regulation beyond those that are clearly "in commerce", e. g., transportation and the production of goods for interstate or foreign sale, to include those which merely assist such activities, e. g., *Heart of Atlanta Motel, supra*, or currently consume goods brought into the state by another, e. g., *Reliance Fuel, supra*. None of these instances purported to eliminate the requirement that there must be regulation of *business*.

advanced another theory, namely, that the houses were being "used" by their owners in the "activity" of arson-for-profit. While we could refuse to entertain this bootstrapping argument as not having been made in the trial court, we prefer to dispose of it as being without merit. Not only is there nothing in the indictment to suggest that the grand jury was proceeding on any such novel theory, but we deem it inconceivable that Congress was thinking of the business of arson when it used the time-honored phrases that it did in § 844(i).

 If we entertained more doubt about the applicability of the statute to this case than we do, we would nevertheless be constrained to affirm the dismissal of the indictment on the basis of the Supreme Court's admonitions that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity", *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493 (1971), and that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definitive". *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221–22, 73 S.Ct. 227, 229, 97 L.Ed. 260 (1952). See *United States v. Bass*, 404 U.S. 336, 347–49, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971), and additional authorities there cited. Moreover, as said in *Bass*, 404 U.S. at 349, 92 S.Ct. at 523, "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance" in the prosecution of crimes. To read § 844(i) as including private residences, even if destroyed by an arson-for-profit scheme, would surely be such a charge.[4]

We are aware that, whatever was or was not the case in 1970, today there is widespread concern over the destruction by their owners of residential as well as business properties by explosives for the purpose of

collecting insurance. We are not holding that Congress could not, with appropriate findings and language, make it a federal crime to do what appellees were charged with doing here. We hold only that Congress did not choose, as the Government contends, to make nearly every bombing in the country a federal offense; it limited its reach to property currently used in commerce or in an activity affecting it, leaving other cases to enforcement by the states.

Affirmed.

intended to punish all arson schemes.

---

4. The legislative history quoted above does not afford the slightest indication that Congress