UNITED STATES of America

v.

William STILLWELL, Sr. and William Stevens, Defendants.

No. 87 CR 193.

United States District Court, N.D. Illinois, E.D.

April 19, 1988.

James D. O'Connell, Asst. U.S. Atty., Chicago, Ill., for U.S.

---

Richard F. Walsh, Kenneth L. Cunniff, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Defendants Stillwell and Stevens were charged with and convicted of conspiracy, arson and mail fraud. Defendants move for judgment of acquittal on the arson count, on the grounds that arson of a private residence that receives natural gas from other states is not arson of a "building ... used in ... [an] activity affecting interstate or foreign commerce" within the meaning of 18 U.S.C. § 844(i) (1982). We disagree, and deny defendants' motion.

## FACTS

Defendants were indicted on five counts: conspiracy (count I), arson (count II) and mail fraud (counts III–V). Stillwell was named in all five counts and Stevens was named in counts I–III. Only count II, the arson count, concerns us here. Specifically, the indictment charged that Stillwell paid Stevens to destroy residential property that Stillwell owned, so that he could collect the insurance proceeds for the loss of his property.

At trial, the parties stipulated that the Stillwell property used natural gas "obtained from sources outside the State of Illinois, most of it arriving in Illinois *via* interstate pipelines from Louisiana and Texas" (exh. 1). The jury was instructed that if it found that the property received natural gas that moved in interstate commerce, then it was required to find that the Stillwell property "was used in an activity affecting interstate and foreign commerce as defined in Section 844(i) of Title 18, United States Code" (exh. 2).

Defendants were convicted on all counts in which they were named. Stillwell received a prison sentence on the mail fraud count and concurrent terms of probation for the four counts remaining. Stevens was sentenced to concurrent terms of probation on all three counts against him and was ordered to participate in alcohol and community service programs.

## DISCUSSION

### I. *Interstate Natural Gas*

The federal arson statute, 18 U.S.C. § 844(i), seeks to punish "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce...." It is not contested that defendants used fire to destroy a building. Rather, the issue is whether the fact that Stillwell's residential property used natural gas from outside Illinois makes it a "building ... used in ... [an] activity affecting interstate ... commerce" under § 844(i), thus bringing defendants' actions within the purview of the federal statute. Though it arises in the somewhat unusual context of a motion to acquit, our inquiry is essentially a jurisdictional one. Defendants assert that since the property was a single-family residence, and not used for any business or commercial purpose, its receipt of gas from other states does not constitute "a sufficient relationship to interstate commerce" to subject it to federal jurisdiction (def. mem. at 3).

Whether the use of interstate natural gas provides federal courts with the proper jurisdictional basis under § 844(i) is an issue that has arisen previously, yet neither the Supreme Court nor the Seventh Circuit Court of Appeals has settled the matter. Indeed, few courts have addressed it head-on, and the Seventh Circuit has twice declined to do so. *See United States v. Moran*, 845 F.2d 135, 138 (7th Cir.1988); *United States v. Russell*, 738 F.2d 825, 827 (7th Cir.1984). In *United States v. Moran*, 663 F.Supp. 19, 19–20 (N.D.Ill.1987), and *United States v. Russell*, 563 F.Supp. 1085, 1086–88 (N.D.Ill.1983), two district courts determined that jurisdiction under § 844(i) was appropriate since the properties at issue in those cases (1) received interstate natural gas and (2) served a business function. In reviewing these decisions the Seventh Circuit affirmed on the "business purpose" ground but did not decide whether a

residential property's use of interstate natural gas subjected it to jurisdiction under the federal arson statute. *See Russell*, 738 F.2d at 827; *Moran*, at 138. The Supreme Court affirmed *Russell* on the basis that the building served a commercial use and that it thus affected interstate commerce for purposes of the federal statute. *Russell v. United States*, 471 U.S. 858, 862, 105 S.Ct. 2455, 2457, 85 L.Ed.2d 829 (1985). The Court left open the question of whether § 844(i) covered residential property. *Id.* ("... Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home.")

In both *Russell* and *Moran* the Seventh Circuit expressly refused to reject the interpretation of § 844(i) given in *United States v. Mennuti*, 639 F.2d 107 (2d Cir. 1981). In *Mennuti, id.* at 111–12, the Second Circuit stated that the legislative history of § 844(i) revealed that the section did not apply to "dwelling houses which were not being used for any commercial purpose at all." The *Mennuti* court's restrictive reading of § 844(i) was only slightly undercut in *United States v. Barton*, 647 F.2d 224, 231–33 (2d Cir.), *cert. denied*, 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), where the Second Circuit upheld a jury instruction defining "affecting interstate commerce" under § 844(i) to include the use of "oil and gas moving in interstate commerce ... to heat the building." The Court in *Barton, id.* at 232 & n. 8, was careful to note that the property before it was used for commercial activity and was not simply a private dwelling, thus distinguishing it from *Mennuti*. While it did not specifically address the portion of the jury instruction defining interstate movement of gas as activity affecting interstate commerce, in *dictum* the Court stated, "We are inclined to believe that the mere fact that a building is insured by an interstate carrier does not meet even the *de minimus* standard for showing that the activity of the building affected interstate commerce." *Id.* at 233. Thus the *Barton* court's explicit effort to distinguish *Mennuti* from the case before it on business purpose grounds, *id.* at 232 n. 8, and its analysis of the insurance portion of the jury instruction, shows no effort by the Seventh Circuit to modify *Mennuti* or address directly the issue of whether the flow of interstate gas qualifies as activity affecting interstate commerce under § 844(i). *But see Russell*, 563 F.Supp. at 1087 (stating that "*Barton* clearly shows that the Second Circuit agrees, as a general matter, that a building heated by out-of-state gas is thereby 'used in' and 'activity affecting interstate or foreign commerce' for purposes of [§ 844(i) ]") (quoting § 844(i)).

While we lack the guidance of clear Supreme Court or Seventh Circuit law specifically addressing the interstate gas issue, *United States v. Sweet*, 548 F.2d 198, 200–02 (7th Cir.), *cert. denied*, 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977), and *United States v. Zabic*, 745 F.2d 464, 470 (7th Cir.1984) (collecting cases), provide us with the general framework by which to approach the matter at hand. In *Zabic*, 745 F.2d at 470, the Seventh Circuit, relying on *Sweet*, 548 F.2d at 202, characterized as "well settled" the law in this circuit that "§ 844(i) is to be interpreted in a broad, expansive manner ..." With this general instruction in mind, we turn to the legislative history of § 844(i) to discern Congress' intent in enacting the provision.

## II. *Legislative History*

From the legislative history there emerges no clear indication of whether Congress intended to distinguish between residential and business property for purposes of § 844(i). Congress provided that

> [s]ince the term affecting [interstate or foreign] "commerce" represents "the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause," *NLRB v. Reliance Fuel Corp.*, 371 U.S. 224, 226 [83 S.Ct. 312, 313, 9 L.Ed.2d 279] (1963), [§ 844(i) ] is a very broad provision covering substantially all business property.

H.R.Rep. No. 91–1549, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad.

News 4007, 4046.[1] This excerpt reveals congressional intent to give far-reaching jurisdictional breadth to § 844(i), while at the same time (indeed in the same sentence) it specifically protects "all business property" and does not mention residential property. Thus Congress' intent here is ambiguous and can be read to support the position of either the government or defendants.

Correspondence from certain Representatives reveals no particular concern with commercial or business properties, as opposed to residential properties. While none comments specifically on the portion of the statute designated § 844(i), in one letter three Representatives note that Title XI, 18 U.S.C. § 841 *et seq.* (the explosives regulation statute of which § 844(i) is a part), in its entirety, was drafted in response to "the bombings shaking our streets and college campuses"). *Id.* at 4090 (letter of Representatives John Conyers, Abner Mikva and William Ryan). This comment by no means conclusively establishes that Congress conceived of protecting more than just commercial property when it passed § 844(i), but it does indicate that at least some members of the House were concerned with destruction of property generally, and not just business property.

Other portions of § 844(i)'s legislative history provide clues as to Congress' intent. The section was amended by the Anti–Arson Act of 1982 to include destruction of buildings by fire. H.R.Rep. No. 97–678, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.Code Cong. & Ad. News 2631. In its discussion of the amendment, Congress noted that Title XI "was designed to provide Federal jurisdiction over the criminal use of explosives," *id.*, thus highlighting a broad jurisdictional purpose behind the statute. Of particular relevance to us is Congress' observation that "[f]ire is used extensively ... for fraud against insurance companies." *Id.* at 2632. While this statement does not bear directly upon the juris-

dictional issue, it does indicate congressional concern with the particular crime that is the basis of defendants' conviction in this case.

Finally, there is language in the legislative history that supports the conclusion that in invoking the Commerce Clause Congress was primarily concerned with ensuring the constitutionality of Title XI and not necessarily with controlling the impact of crimes involving explosives on commerce. *Cf. Scarborough*, 431 U.S. at 575 n. 11, 97 S.Ct. at 1969 n. 11 ("Congress was not particularly concerned with the impact [of receipt and possession of guns] on commerce except as a means to ensure the constitutionality of Title VII.") According to Congress,

[t]he [judiciary] committee's principal aim [in reviewing Title XI] has been to eliminate provisions vulnerable to constitutional objections and to revise sections deemed unworkable so that the legislation will withstand future court challenge.

H.R.Rep. No. 91–1549, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad. News 4007. About § 844(i) specifically, Congress stated that

[w]hile [the] provision is broad, the [judiciary] committee believes that there is no question that it is a permissible exercise of Congress' authority to regulate and to protect interstate and foreign commerce.

*Id.* at 4046. While the second excerpt is susceptible of different meanings, its tone is somewhat territorial and protective of Congress' power to legislate broadly. The passages thus indicate that Congress may have been less concerned with regulating only activities affecting commerce than with drafting legislation that would withstand judicial scrutiny.

As the abovementioned observations indicate, the legislative history of § 844(i) is at best ambiguous. What little can be understood about the congressional intent behind

---

**1.** As opposed to legislation limited to activities "in commerce," coverage of "all activities substantially affecting interstate commerce" represents congressional assertion of its full power under the Commerce Clause. *Scarborough v.*

*United States,* 431 U.S. 563, 571, 97 S.Ct. 1963, 1967, 52 L.Ed.2d 582 (1977); *United States v. American Bldg. Maintenance Industries,* 422 U.S. 271, 280, 95 S.Ct. 2150, 2156, 45 L.Ed.2d 177 (1975).

§ 844(i), as it relates to the distinction between commercial and residential property, and to activities that do or do not affect commerce, points to an expansive reading of the section—one unencumbered by the "business purpose" limitation. Since the history of the section provides us with no clear direction, however, we turn to the law that defines the reach of the Commerce Clause to determine whether the Stillwell property's receipt of natural gas from other states brings it within the ambit of § 844(i).

### III. *Commerce Clause Jurisprudence*

The government suggests that we rely on *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed. 2d 258 (1964), and *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), to find that the Commerce Clause mandates an interpretation of § 844(i) that defines use of interstate natural gas as an activity affecting interstate commerce. The government's argument overlooks an important distinction between those cases and the one at hand. In cases brought under the Civil Rights Act of 1964, such as *Atlanta Motel*, 379 U.S. at 247, 85 S.Ct. at 352, and *Katzenbach*, 379 U.S. at 303, 85 S.Ct. at 383, the Court noted that Congress had explicitly deemed certain activity to affect commerce within the meaning of the Civil Rights Act. Similarly, in *FERC v. Mississippi*, 456 U.S. 742, 755, 102 S.Ct. 2126, 2135, 72 L.Ed.2d 532 (1982), an action brought under the Public Utility Regulatory Policies Act of 1978, the Court observed that Congress had made a specific finding that the regulation of certain utilities had "an immediate effect on interstate commerce." Similarly, in *Scarborough*, 431 U.S. at 571, 97 S.Ct. at 1967, the Court noted that "Congress expressly declared that 'the receipt, possession, or transportation of a firearm by felons ... constitutes ... a burden on commerce or threat affecting the free flow of commerce'" (citation omitted). In upholding the validity of Congress' actions in all of these cases the Court invoked the principle that once "Congress itself has said that a particular activity affects the commerce ... the only func-

tion of courts is to determine whether the particular activity regulated or prohibited is within the reach of federal power." *United States v. Darby*, 312 U.S. 100, 120–21, 61 S.Ct. 451, 460, 85 L.Ed. 609 (1941); *see Perez v. United States*, 402 U.S. 146, 152–54, 91 S.Ct. 1357, 1360–61, 28 L.Ed.2d 686 (1971) (restricted judicial review appropriate once Congress declares that a particular activity "affects the commerce").

Here, in contrast, there is no congressional statement in either the text of § 844(i) or its legislative history, and there are no congressional findings that use of natural gas from other states affects interstate commerce. Since Congress has not specifically declared that the use of natural gas "affects" commerce under § 844(i), we employ a searching review to determine whether the Commerce Clause permits such an interpretation.

While *Atlanta Motel*, 379 U.S. 241, 85 S.Ct. 348, *Katzenbach*, 379 U.S. 294, 85 S.Ct. 377, and *FERC*, 456 U.S. 742, 102 S.Ct. 2126, do not present situations entirely analogous to the one we now confront since the Court reviewed each statute at issue in those cases against the backdrop of clear congressional intent, they are instructive in defining the parameters of congressional power under the Commerce Clause.

In *Atlanta Motel*, 379 U.S. at 261, 85 S.Ct. at 359, and *Katzenbach*, 379 U.S. at 304, 85 S.Ct. at 383, the Court held that establishments serving interstate travelers, and restaurants serving food transported from other states, were engaged in interstate commerce. More recently, Justice Blackmun, writing for the majority in *FERC*, 456 U.S. at 757, 102 S.Ct. at 2136, stated explicitly that "it is difficult to conceive of a more basic element of interstate commerce than electric energy, a product used in virtually every home and in every commercial and manufacturing facility. No State relies solely on its resources in this respect." We see no reason to distinguish between natural gas and electric energy for purposes of our analysis. Since there is no natural gas in Illinois, and natural gas is used widely through the state,

residents of, and commercial enterprises located in Illinois must rely on the resources of other states. Such dependence among the states fits within the definition of interstate commerce, as developed by the Supreme Court, and the fact that this case arises in the criminal law context does not alter our analysis under the Commerce Clause. *See Perez*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (applying Commerce Clause analysis in criminal context); Stern, *The Commerce Clause Revisited—The Federalization of Intrastate Crime*, 15 Ariz.L.Rev. 271, 279–80 (1973) (analyzing cases following approach in *Perez* ).

■ While at first blush arson may "smell" like a state crime that should not be federalized by statute, *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 546–47, 105 S.Ct. 1005, 1015, 83 L.Ed.2d 1016 (1985), instructs us, when engaging in Commerce Clause analysis, not to "draw boundaries" between traditional state functions and areas that appear to fit within the province of the federal government. In overruling *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), Justice Blackmun stated, "We doubt that courts ultimately can identify principled constitutional limits on the scope of Congress' Commerce Clause powers over the states merely by relying on *a priori* definitions of state sovereignty." *Garcia*, 469 U.S. at 548, 105 S.Ct. at 1016. The Court concluded that it had "no license to employ freestanding conceptions of state sovereignty when measuring congressional authority under the Commerce Clause." *Id.* at 550, 105 S.Ct. at 1017. Thus the fact that punishing those who commit arson initially seems to be a task properly left to the states, does not limit congressional power to legislate in this area under the Commerce Clause. *But see Perez*, 402 U.S. at 158, 91 S.Ct. at 1363. (Stewart, J., dissenting) ("The definition and prosecution of local, intrastate crimes are reserved to the states under the Ninth and Tenth Amendments.")

■ We find that traditional Commerce Clause analysis dictates our holding today and note that the Supreme Court's interpretation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961 *et seq.*, grants similarly broad jurisdictional power to the federal government. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). We are cognizant however that in *McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987), the Court recently read the federal mail fraud statute, 18 U.S.C. § 1341, as "limited in scope to the protection of property rights." In so doing, the Court prevented the federal government from reaching crimes involving "intangible rights, such as the right to have public officials perform their duties honestly." *Id.* 107 S.Ct. at 2880–81. The Court based the *McNally* decision on its determination that in enacting the mail fraud statute Congress sought to codify "common understanding," and punish those whose schemes to defraud involve deprivations of "money or property." *Id.* The Court concluded that "[i]f Congress desires to go further, it must speak more clearly than it has." *Id.* 107 S.Ct. at 2881. In light of the Court's historically expansive jurisdictional reading of the Commerce Clause (and of RICO), *McNally* is only tangentially relevant to the case at hand. However, the decision does indicate that the government's power to reach criminal activity *via* federal statute is by no means unlimited and, absent a clear congressional mandate, courts may interpret jurisdictional grants under such statutes restrictively.

## CONCLUSION

In light of the Seventh Circuit's directive to interpret § 844(i) broadly, the indications in the legislative history that an expansive reading is proper, and the Supreme Court decisions giving the Commerce Clause far-reaching effect, we find that § 844(i) is not limited strictly to business or commercial property, and we deny defendants' motion.