UNITED STATES of America,
Plaintiff–Appellee,

v.

William STILLWELL, Sr. and William
Stevens, Defendants–Appellants.

Nos. 88–1813, 88–1814.

United States Court of Appeals,
Seventh Circuit.

Argued May 18, 1989.
Decided April 25, 1990.*

* This opinion was circulated to all judges of the court in regular active service pursuant to Circuit Rule 40(f) on the issue of whether Congress intended the federal arson statute (18 U.S.C. § 844(i)) to cover arson of a private residence that is not used in any commercial activity. A majority of the judges did not favor a rehearing en banc.

Anton R. Valukas, U.S. Atty., Helene B. Greenwald, David J. Stetler, Victoria J. Peters, Howard M. Pearl, Asst. U.S. Attys., Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for U.S.

Richard F. Walsh, Rothschild, Barry & Myers, Chicago, Ill., for William Stillwell, Sr.

Kenneth L. Cunniff, Chicago, Ill., for William M. Stevens.

Before WOOD, Jr., EASTERBROOK, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

In the summer of 1983, defendant William Stillwell, Sr. attempted to end his financial woes by burning down his Alsip, Illinois house and collecting the insurance. Stillwell offered $5,000.00 to his codefendant William Stevens, and a friend named Raymond Schultz, to set the fire. Stevens and Schultz both agreed as the list of participants grew. In preparation for the arson, Stevens asked his friend, Richard Pischler, to get some paint thinner. Pischler in turn had his girlfriend, Virginia Harnish, buy five cases of paint thinner from the Calumet Paint & Wallpaper Store. Stevens then told Schultz that he had secured the paint thinner through Pischler and Harnish. Stevens hired someone he met at a bar to start the fire. At about 4:30 a.m. on July 3, 1983, a fire was set at Stillwell's home. The fire did not burn rapidly, however, and the fire department quickly extinguished the flames before the house was destroyed. Stillwell and Schultz were both out of town that weekend. When Schultz returned (sometime around July 6th), Stillwell told him that Stevens had someone set the house on fire, but that the house "didn't hardly burn ... at all." Stillwell then asked Schultz if he would do the job right and burn the house completely. Schultz declined the offer and instead reported Stillwell and Steven's arson activities to the FBI.

Following the July 3rd fire, Stillwell submitted a claim to his insurance company. Three mailings were made through the U.S. Postal Service in connection with this claim. Stillwell hired an insurance adjuster who mailed a proof of loss to the insurance company and on two occasions, Stillwell mailed various documents the insurance company required in order to adjust the claim.

In September, 1987, a grand jury returned a five-count indictment against Stillwell and Stevens. Count One charged the defendants with conspiring to damage and destroy Stillwell's house by means of fire. Count One also charged the defendants with conspiring to devise a scheme to defraud the insurance company and in furtherance of that scheme, causing various documents to be mailed. Count Two charged defendants with violating the federal arson statute, by damaging and destroying, and attempting to damage and destroy, by means of fire, a residence that was used in activities that affected interstate commerce. Counts Three, Four and Five were the substantive mail fraud counts. Stillwell and Stevens were tried before a jury and convicted of all counts.

Defendants now appeal their convictions. With respect to Count One (the arson conspiracy charge) and Count Two (the substantive arson charge), defendants contend that their convictions should be reversed because Stillwell's private residence did not satisfy the arson statute's requirement that the building subject to the arson be "used in [an] ... activity affecting interstate ... commerce." In addition, defendants argue that if Congress did intend the federal arson statute to reach a private residence such as Stillwell's, then Congress exceeded its power under the commerce clause. Finally, defendants claim that the district court erred in denying defendants' motion for a mistrial or a new trial based on comments the prosecution made in its closing argument. 690 F.Supp. 641 (N.D. Ill.1988). For the reasons discussed below, we affirm the defendants' convictions.

### Scope of the Federal Arson Statute

■ Defendants contend that their convictions for arson of a private residence not used in any commercial activity exceeds the statutory authority granted by 18 U.S.C. § 844(i), the federal arson statute. Section 844(i) provides:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000.00, or both.

Defendants argue that Stillwell's residence was not "used in interstate or foreign commerce" or "in an activity affecting interstate or foreign commerce." At trial, the parties stipulated that the only nexus between Stillwell's house and interstate commerce was that Northern Illinois Gas Company supplied Stillwell's house with natural gas it obtained from sources outside the State of Illinois. Thus, we must determine whether Congress intended the arson statute's interstate commerce requirement to be satisfied in a case where a private residence serves no business purpose and merely receives natural gas from out of state.

This court has considered, but left open, the question whether the supply of interstate natural gas alone satisfies the arson statute's commerce requirement. In *United States v. Russell*, 563 F.Supp. 1085 (N.D.Ill.1983), *aff'd*, 738 F.2d 825 (7th Cir. 1984), *aff'd*, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), the district court held that Congress intended § 844(i) to cover the arson of a two-unit apartment building that received interstate natural gas. 563 F.Supp. at 1086. The district court reasoned that the building at issue was "business property," which Congress clearly intended to reach, because the building was utilized for the commercial purpose of providing housing space for rent. *Id.* at 1088. In addition, the district court reasoned that the supply of interstate natural gas alone

satisfied the interstate commerce requirement because the creation of heat from natural gas originating out of state is an "'activity affecting interstate or foreign commerce.'" *Id.* at 1086–88. On appeal, this court affirmed solely on the ground that the rental apartment building was "business property." 738 F.2d at 827. We stated that it was not necessary to adopt the district court's rationale regarding the supply of natural gas and thereby create a conflict with *United States v. Mennuti,* 639 F.2d 107 (2d Cir.1981), where the Second Circuit held § 844(i) does not apply to "dwelling houses which were not being used for any commercial purpose at all." *Id.* The Supreme Court affirmed *Russell,* holding that the building was unquestionably business property used in an activity that affects commerce. 471 U.S. at 862, 105 S.Ct. at 2457. The Supreme Court did not address the issue of whether § 844(i) would cover a private family residence if the supply of interstate natural gas was its only connection to interstate commerce.

In *United States v. Moran,* 663 F.Supp. 19 (N.D.Ill.1987), *aff'd,* 845 F.2d 135 (7th Cir.1988), the district court had to determine whether § 844(i) covered the arson of a private residence where the basis for federal jurisdiction was that (1) the home owner used a business-owned computer at the house for company business and (2) the home was supplied with interstate natural gas. The district court held that § 844(i) jurisdiction was appropriate under either of these two alternative bases. 663 F.Supp. at 19–20. On appeal, this court held that the home use of a computer for business purposes was sufficient by itself to bring the case within the scope of § 844(i). We specifically declined to hold that the supply of interstate natural gas subjected the private residence to § 844(i) jurisdiction. 845 F.2d at 138. We reasoned that the residence's use for a business purpose distinguished the case from *Mennuti* and made it unnecessary for us to reject *Mennuti.* *Id.* at 137.

Most recently, in *United States v. Doby,* 684 F.Supp. 558 (N.D.Ind.1988), *aff'd* 872 F.2d 779 (7th Cir.1989), the district court held that § 844(i) covered the arson of a

two-unit house in which the owner had at one time rented out one of the units. At the time of the arson, the entire house was vacant and in need of rehabilitation work. Although the rental unit had been vacant for over six months, the owner never took it off the rental market and intended to repair the house and rent the unit again. 684 F.Supp. at 561. On appeal, this court affirmed. We adopted the district court's reasoning that the house was commercial property and, because of this, added that "we need not reach the government's contention that the arson fell within § 844(i) because the home received natural gas from an out-of-state source." 872 F.2d at 780.

Unlike our previous cases, the Stillwell house has no connection to a commercial activity which could lead us to conclude the Stillwell house is "business property." Nonetheless, we believe Congress intended § 844(i) to reach a private residence which is supplied with interstate natural gas. The Supreme Court's opinion in *Russell,* which was decided after *Mennuti,* plus the Court's interpretation of the arson statute's legislative history, compel us to disagree with the Second Circuit's conclusion that § 844(i) does not cover any private residence not used for a business purpose.

At the outset, we note that the plain language of § 844(i) does not exclude private residences nor otherwise limit the statute's coverage to properties used for business purposes. Section 844(i) prohibits damage or destruction by means of fire of *"any building ...* used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce." (emphasis added). The words of a statute must, if at all possible, be given their ordinary meaning. *E.g., United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). Applying the plain language of § 844(i), the test of whether the statute covers a building does not depend on whether or not the building is used for a business purpose. Rather, the test depends solely on whether the building is used in interstate commerce or in an activity that affects interstate com-

merce. If a private residence is used in an activity affecting interstate commerce, the plain language of the statute encompasses that residence whether or not the residence is used for a business purpose.

In *Russell v. United States*, 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), the Supreme Court reached this same conclusion by doing an extensive review of the legislative history of § 844(i). The Court noted that the original version of § 844(i) submitted to Congress expressly limited the statute's reach to property used for "business purposes." The original bill provided:

> Whoever maliciously damages or destroys or attempts to damage or destroy, by means of an explosive, any building, vehicle, or other real or personal property used *for business purposes* by a person engaged in commerce or in any activity affecting commerce shall be imprisoned for not more than ten years or fined not more than $10,000.00, or both.... *Hearings on H.R. 17154, H.R. 16699, H.R. 18573 and Related Proposals Before Subcomm. No. 5 of the House Comm. on the Judiciary*, 91st Cong., 2d Sess. 30 (1970) (hereinafter *Hearings*) (emphasis added).

As the Court in *Russell* explained, some congressmen expressed concern over limiting the bill to business property. In a colloquy between members of a House Judiciary Subcommittee and Assistant Attorney General Will R. Wilson, Mr. Wilson expressed his belief that the proposed bill would not cover either public buildings or private homes under normal use but was designed to cover only business offices. The subcommittee chairman queried whether the committee wanted to broaden the provision to cover a private dwelling or a church or other property not used in business. Congressman Wylie stated that as far as he was concerned, "we could leave out the words 'for business purposes,' and it would help the situation...." Ultimately, the bill was revised to eliminate the words "for business purposes" from the description of covered property. *Russell*, 471 U.S. at 861, 105 S.Ct. at 2457 n. 7 (citing *Hearings* at 300). After reviewing

this legislative history, the Court concluded that "the legislative history suggests that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home." *Id.* at 862, 105 S.Ct. at 2457.

In order to determine what private residences Congress intended § 844(i) to cover, it is instructive to examine the Court's analysis of how far Congress generally intended § 844(i) to reach. The Court's interpretation of the statute's legislative history demonstrates that limitations on the scope of the statute come not from Congress' intent to limit the statute's coverage, but from Congress' own recognition that there are constitutional limits to the property it can reach. In *Russell*, the Court reasoned that, "the reference [in § 844(i) ] to '... used in ... any activity affecting interstate or foreign commerce' expresses an intent by Congress to exercise its full power under the Commerce Clause." In reaching this conclusion, the Court focused on the distinction between the phrases "in commerce" and "affecting commerce," both of which are used in § 844(i). The Supreme Court stated that " 'Congress is aware of the "distinction between legislation limited to activities 'in commerce' and an assertion of its full Commerce Clause power as to cover all activity substantially affecting interstate commerce." ' " *Id.* at 859, 105 S.Ct. at 2456 n. 4. The Court noted that in the floor debates on the final bill, Representative McCullough, the sponsor of the bill, stated that "[t]he committee extended the provision protecting interstate and foreign commerce from the malicious use of explosives to the full extent of our constitutional powers." *Id.* at 862, 105 S.Ct. at 2457 n. 9 (citing 116 Cong.Rec. 35198). Representative MacGregor stated that "the reach of the law ... is greatly extended by making it unlawful to damage or destroy property which is used in or affects interstate commerce. Nearly all types of property will now be protected by the Federal law." *Id.* at 862, 105 S.Ct. at 2457 n. 9 (citing 116 Cong.Rec. at 37187). In addition, the final report on the bill stated that

"[s]ince the term affecting 'commerce' represents 'the fullest jurisdictional breath constitutionally permissible under the Commerce Clause,' ... this is a very broad provision concerning substantially all business property." *Id.* at 861, 105 S.Ct. at 2457 n. 8 (citing H.R.Rep. No. 91–1549 pp. 69–70, U.S.Code Cong. & Admin.News pp. 4007, 4046).

On the other hand, Representative Celler expressed the opinion that "the mere bombing of a private home even under this bill would not be covered because of the question whether the Congress would have the authority under the Constitution." *Id.* at 861–62, 105 S.Ct. at 2457 (citing 116 Cong. Rec. at 35359). It is important to note that, in reaching his conclusion, Representative Celler did not rely on congressional intent to exclude private homes. Rather, he relied on the fact that Congress may not have the power under the commerce clause to reach private homes. The inference is that if a private residence did have a sufficient connection with interstate commerce to satisfy the commerce clause, the statute would cover that residence.

As mentioned, our decision today conflicts with the Second Circuit's holding in *Mennuti.* In *Mennuti,* the defendants were charged with destroying two private residences with explosives. Conceding that the two residences were in no way used for commercial purposes, the government attempted to establish the interstate commerce requirement by showing that the residences received out-of-state electrical power, financing, insurance, and building materials. 639 F.2d at 112. The Second Circuit held that the defendants' conviction exceeded the authority Congress granted under § 844(i) because Congress did not intend § 844(i) to reach any private residence that was not used for commercial purposes. *Id.* at 111–12.

The court in *Mennuti* centered its analysis around the assumption that "[t]he critical word ... in the statute ... is 'used.'" The court reasoned that "Congress did not define the crime described in § 844(i) as explosion of a building whose damage or destruction might affect interstate commerce as we assume it constitutionally could have done ... it chose to require that the damaged or destroyed property must itself have been used in commerce or in an activity affecting commerce." The court stated that "[i]t is not enough under the statute that the quantum of commerce might differ if the dwelling ... were destroyed." *Id.* at 110. Therefore, the court in *Mennuti* concluded that a private residence that serves no business purpose cannot be said to be *"used* in interstate or foreign commerce or any activity affecting interstate or foreign commerce." *Id.* at 109 (emphasis in original).

We believe the Supreme Court squarely rejected the rationale of *Mennuti* in *Russell.* In *Mennuti,* the Second Circuit reasoned that by including the "used in" language in § 844(i), Congress did not intend the arson statute to cover as many buildings as the commerce clause allowed it to. In *Russell,* however, the Supreme Court made clear that the "used in" language was not intended to limit the reach of the statute. The Court in *Russell* stated that "the reference in § 844(i) to any building used in any activity affecting interstate or foreign commerce expresses an intent by Congress to exercise its *full power* under the Commerce Clause." 471 U.S. at 859, 105 S.Ct. at 2456 (emphasis added). According to *Russell,* Congress intended § 844(i) to reach every private residence it constitutionally has the power to reach, whether or not the residence is used for commercial purposes.

The court in *Mennuti* also emphasized the language in the final report on the arson bill that § 844(i) "is a very broad provision covering substantially all business property." 639 F.2d at 111. In *Russell,* however, the Supreme Court stated that the reference to business property in the final report did not indicate an intention by Congress to limit § 844(i) to business property. Rather, the *Russell* Court stated that the legislative history indicates that Congress intended to reach all business property "as well as some additional prop-

erty that may not fit that description...."
471 U.S. at 862, 105 S.Ct. at 2457.[1]

■ In sum, the plain language, the legislative history and the Supreme Court's interpretation of the legislative history all indicate that Congress did not intend to limit the scope of the federal arson statute to properties that serve a business purpose. Rather, Congress intended the statute to cover all properties it has the power to reach under the commerce clause. Thus, our next inquiry is whether Congress has the constitutional authority to outlaw arson of a private residence where the supply of interstate natural gas is the only connection between that residence and interstate commerce.[2]

### Authority of Congress under the Commerce Clause to Proscribe Arson of Stillwell's Residence

■ Congress enacted § 844(i) pursuant to the Commerce Clause of the United States Constitution, which gives Congress the power "[t]o regulate commerce with foreign nations and among the several States, and with Indian Tribes." U.S. Const. art. I, § 8, cl. 3. Congress has the power to enact a criminal statute pursuant to the commerce clause as long as the statute controls acts which have, at least, a *de minimis* effect on interstate commerce. *United States v. Kimberlin*, 805 F.2d 210, 242 (7th Cir.1986); *United States v. Zabic*, 745 F.2d 464, 470 (7th Cir.1984); *United*

States v. Sweet, 548 F.2d 198, 202 (7th Cir.1977).

In *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), the defendant contended that Congress exceeded its constitutional power under the commerce clause in enacting a criminal statute prohibiting local loan sharking. In holding that Congress had the power to enact the loan sharking statute, the Court emphasized that Congress can proscribe an activity whenever it is one of a class of activities that has the necessary effect on commerce. The Court said it was irrelevant whether the individual loan at issue in *Perez* had the necessary effect on commerce because "[w]here the *class of activities* is regulated and that *class* is within the reach of federal power, the courts have no power 'to exercise, as trivial, individual instances' of the class." *Id.* at 154, 91 S.Ct. at 1361 (emphasis added). The Court demonstrated that this principle is consistent with its commerce clause precedents. For instance, in *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941), a criminal prosecution, a unanimous Court upheld an act of Congress prohibiting the employment of workers in the production of goods "for interstate commerce" at other than prescribed wages and hours. The Court held that Congress properly regulated a class of activities without proof that the particular activity prohibited in *Darby* had an effect on commerce. *Id.* at 120–21, 61 S.Ct. at 460. In *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), a

---

**1.** In *United States v. Patterson*, 792 F.2d 531 (5th Cir.), *cert. denied*, 479 U.S. 865, 107 S.Ct. 220, 93 L.Ed.2d 149 (1986), the Fifth Circuit made a similar observation:

> [T]he *Russell* analysis casts doubt on the *Mennuti* reasoning that the property involved must be devoted to commercial purposes before § 844(i) applies. In *Russell*, the Court stated that Congress 'intended to protect all business property, as well as some additional property,' and suggested that the statute may cover some churches as well as certain private homes.
> *Id.* at 535.

**2.** The government argues that defendants waived the argument that Congress does not have power under the commerce clause to proscribe arson of Stillwell's house because defen-

dants did not make this argument to the district court. While we agree that defendants did not raise this issue at the district court level, defendants may raise this issue on appeal because it is jurisdictional. If the application of § 844(i) to defendants exceeds Congress' power under the commerce clause, the district court could not exercise jurisdiction over the subject-matter contained in Count One (the arson conspiracy charge) and Count Two (the substantive arson charge). Lack of subject-matter jurisdiction, whether through statutory interpretation or constitutional prescription, is never waived. *Insurance Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 702, 102 S.Ct. 2099, 2104, 72 L.Ed.2d 492 (1982); *United States v. Isaacs*, 493 F.2d 1124, 1140 (7th Cir.1974), *cert. denied sub nom, Kerner v. United States*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1975).

unanimous Court held that Congress had the power to regulate the quantity of wheat a farmer grew wholly for home consumption. The Court reasoned that, even though the farmer did not market his wheat interstate, the quantity he grew supplied his demand, which he otherwise would satisfy by purchases in the open market. The Court stated, "[t]hat appellee's own contribution to the demand for wheat may be trivial by itself is not enough to remove him from the scope of federal regulation where, as here, his contribution, taken together with that of many others similarly situated, is far from trivial." *Id.* at 127–28, 63 S.Ct. at 90. The Court also employed the "class of activities" test to sustain acts of Congress requiring hotel and motel accommodations, *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), and access to restaurants for blacks, *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). Rather than look at individual instances of racial discrimination, the Court emphasized that the class of activities regulated was the appropriate measure and that Congress properly considered the "total incidence" of hotel, motel, and restaurant discrimination on commerce. *Id.* at 301, 85 S.Ct. at 382.

█ Thus, our inquiry is not whether Stillwell's and Stevens' actions alone had the necessary *de minimis* effect on interstate commerce. Rather, the relevant inquiry is whether the aggregate class of activities, here, all arson of private homes supplied with interstate natural gas, has more than a *de minimis* effect on interstate commerce. Initially, that determination belonged to Congress when it passed the federal arson statute. Our task, which is to decide whether Congress made a valid determination, is relatively narrow. If we find that Congress has any rational basis for finding that a regulated activity affects interstate commerce, our investigation is at an end. *Heart of Atlanta Motel,* 379 U.S. at 258, 85 S.Ct. at 358; *McClung,* 379 U.S. at 303–04, 85 S.Ct. at 383; *Maryland v. Wirtz,* 392 U.S. 183, 190, 88 S.Ct. 2017, 2020, 20 L.Ed.2d 1020 (1968); *Hodel v. Virginia Surface Mining & Reclamation As-* *soc.,* 452 U.S. 264, 276, 101 S.Ct. 2352, 2360, 69 L.Ed.2d 1 (1981). In light of the Court's expansive view of Congress' power to legislate under the commerce clause, we think Congress could rationally believe that, in the aggregate, arson of private residences supplied with interstate natural gas has more than a *de minimis* effect on interstate commerce.

Our holding is not affected by the fact that Congress did not make specific findings regarding what effect arson of private homes supplied with interstate natural gas has on interstate commerce. In *Perez,* the Court noted that, in passing the loan sharking statute, Congress made extensive findings regarding the effect of local loan sharking on interstate crime and on the flow of interstate commerce. Although the Court reviewed those findings, the Court also stated that it did not mean to imply Congress had to make such particularized findings in order to legislate. 402 U.S. at 156, 91 S.Ct. at 1362. In addition, the Court has noted that it is "quite irrelevant" that legislative history accompanying amendments to an Act does not provide a factual predicate for extensions of the Act when the original Act stated Congress' findings and purposes. *Wirtz,* 392 U.S. at 190, 88 S.Ct. at 2020–21 n. 13. Subsequent extensions of coverage are presumably based on similar findings and purposes with respect to newly covered areas and courts should not be concerned with the manner in which Congress reached its factual conclusions. *Id.* In passing Title XI of the Organized Crime Control Act of 1970, of which § 844(i) is a part, Congress made extensive findings regarding the effect of crime on interstate commerce and the economy. In light of those findings, it is irrelevant that Congress did not make particularized findings to support an extension of § 844(i) to cover a private residence supplied with interstate natural gas.

█ Congress intended § 844(i) to cover any building it constitutionally has the power to reach. Since Congress could reasonably believe that arson of private homes receiving interstate natural gas has more than a *de minimis* effect on interstate

commerce, the application of § 844(i) to defendants in this case is not an unconstitutional exercise of power. Defendants contend that our holding stretches federal jurisdiction beyond acceptable bounds. However, we believe Supreme Court precedent mandates the result we reach today. As Judge Wood stated in *United States v. Sweet*, 548 F.2d 198 (7th Cir.1977), any stretching in this area was long ago accomplished.

### The Prosecutor's Comments During Closing Argument

Defendants contend that the prosecutor made three improper comments during closing argument which so prejudiced defendants as to deprive them of a fair trial. The government made one of these comments in reference to Billy Stillwell, Jr., another in reference to Richard Pischler and the third in reference to Virginia Harnish.

One of the government's main witnesses was William Stillwell's 21–year–old son, Billy Stillwell, Jr. Billy Stillwell, Jr. overheard some of the defendants discuss the arson and testified to those conversations at trial. Stillwell, Jr. also observed his father take various steps to prepare for the arson. In rebuttal, the prosecutor stated with regard to Billy Stillwell's testimony that:

> Well, ladies and gentlemen, that is why we asked him were you told that the government had a witness Schultz who says that your father torched the house, and he told you no. You also remember I tried to ask Ivan Harris (an FBI agent) on the stand, sir, did you ever tell Billy, Jr., in your interview with him in January of '85 that you had a witness Schultz who says, blah, blah, blah, and you remember that there was an objection to that, so you didn't get to hear what his answer was.

Defendants argue this comment prejudiced them and entitles them to a new trial because it invited speculation as to Agent Harris' answer.

▮ Defendants are entitled to a new trial only if the government's comments

were improper ones that prejudiced the defendants' rights to a fair trial. *United States v. Napue*, 834 F.2d 1311, 1324 (7th Cir.1987); *United States v. Touloumis*, 771 F.2d 235, 243 (7th Cir.1985). It is, of course, improper to suggest that opposing counsel's objection was not proper or to rely on information not in evidence. It is also improper to inform the jury that there is information not in evidence that supports the government's case. *See United States v. Keskey*, 863 F.2d 474, 479–80 (7th Cir. 1988); *United States v. Perez–Leon*, 757 F.2d 866, 875–77 (7th Cir.), *cert. denied*, 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *United States ex rel. Shaw v. DeRobertis*, 755 F.2d 1279, 1281 (7th Cir.1985). In determining whether comments prejudiced the defendants' right to a fair trial, however, the comments must be viewed in the context of the entire trial. *United States v. Young*, 470 U.S. 1, 11, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). *Napue*, 834 F.2d at 1324; *United States v. Chu*, 779 F.2d 356, 370 (7th Cir.1985). When viewed in context, we do not think the prosecutor's comment regarding Billy Stillwell, Jr. was improper. In his opening statement, defense counsel strongly implied that Billy Stillwell, Jr. and Raymond Schultz were lying. Defense counsel also suggested that the FBI told Billy Stillwell, Jr. what Raymond Schultz told the FBI about the arson and essentially "planted" Billy Stillwell, Jr.'s testimony about overhearing his father discuss the arson. In closing, defense counsel again attacked Billy Stillwell, Jr.'s credibility and claimed that Stillwell made up his story. Given this context, the prosecutor's comment did not suggest that defense counsel's objection was improper or inform the jury that information not in evidence supports the government's case. The prosecution's reference to its questioning of FBI agent Harris and the subsequent objection was only meant to focus the jury's attention on the fact that there was no evidence in the record to support the claim that the FBI suggested Billy Stillwell's testimony to him.

▮ In addition, even if we thought the prosecutor's comment was improper, we do

not think the comment prejudiced the defendants. Following the prosecutor's comment, the court sustained defense counsel's objection and immediately instructed the jury to disregard the comment. During jury instructions, the court instructed the jury that they should not be influenced by the fact that counsel objected from time to time and that they were to disregard any evidence the district court sustained an objection to or ordered stricken. In addition, after defense counsel objected, the prosecution clarified the point it sought to make by explaining to the jury that "there is no suggestion at all that the question means anything, and clearly don't hold it against defense lawyers that they object. We both object when we think it is proper."

Defendants also contend that the prosecutor's comments regarding Richard Pischler and Virginia Harnish constitute reversible error. At trial, Raymond Schultz testified that Stevens told him Stevens contacted an old friend named Pischler and asked Pischler to get Stevens some paint thinner for the arson. Pischler in turn had his girlfriend, Virginia Harnish, buy the paint thinner. Vernon Dell, the manager of Calumet Paint & Wallpaper, testified that sometime in June of 1983 he sold five cases of paint thinner to a woman he later identified as Virginia Harnish. Neither Pischler nor Harnish testified at trial. Pischler indicated he would invoke his privilege against self-incrimination if called to testify and, therefore, was not available to the government. The district court ruled that defendants could not argue in closing that Richard Pischler was a missing witness. The district court ruled that defendants could argue Virginia Harnish was a missing witness since the prosecution informed the court that, as far as they knew, Harnish would not invoke her right against self-incrimination.

■ In his closing argument, Stevens' defense counsel argued that Harnish was a missing witness. He also repeatedly made reference to Richard Pischler in the context of his missing witness argument about Harnish. In rebuttal, the prosecutor began to respond to defense counsel's argument

about Pischler and Harnish by stating: "Okay, another red herring. Where are the missing witnesses? Where is Virginia Harnish, *where is Richard Pischler*?" Defendants contend the government improperly argued that Richard Pischler was a missing witness in an attempt to induce the jury to draw an adverse inference from his absence. We disagree. It appears that the prosecutor was not making a missing witness argument but was simply repeating the argument Stevens' defense counsel made in his closing argument. Stevens' defense counsel repeatedly made reference to Richard Pischler in the context of his missing witness argument about Harnish. In fact, the district court observed that defense counsel made a linkage between Harnish and Pischler in his "missing witness" argument. More importantly, the prosecutor's comment did not prejudice the defendants. It was the government, not the defendants, that did not want the missing witness argument made or the adverse inference drawn from Pischler's absence. Immediately after the prosecutor made the "where is Richard Pischler?" comment, defendants requested the district court to allow them to argue that Pischler was a missing witness, the very argument they now claim prejudiced them.

■ During rebuttal, the prosecutor responded to the argument that Virginia Harnish was a missing witness as follows:

Where is she? Obviously, if the defense thought that she was a helpful witness, they would have subpoenaed her. But more importantly, ask yourselves in terms of common sense what you would expect if she had appeared on the witness stand. Is she going to stand there and say, yea, that's true, Bill Stevens came into the bar one night when, you know, Richard and I were sitting there drinking, he talked about an arson, we discussed buying paint thinner, and I said, okay, and Richard asked me to go down the block and get the paint thinner, and I did that? Is she going to do that or is she going to take the fifth amendment, or is she going to get up and lie on the witness stand?

Defendants contend this statement prejudiced them because it left the jury with the impression that if Harnish testified truthfully, she would implicate the defendants. Defendants also contend that the prosecutor did not have a good faith basis on which to tell the jury that Harnish might invoke the fifth amendment if called to testify. In *United States v. Solina,* 733 F.2d 1208 (7th Cir.), *cert. denied,* 469 U.S. 1039, 105 S.Ct. 519, 83 L.Ed.2d 408 (1984), this court indicated that when a defendant speculates on a specific matter during closing argument, it is fair reply for the prosecution to speculate on that matter in rebuttal. *Id.* at 1213–14; *see also Perez–Leon,* 757 F.2d at 875 (prosecutor justified in responding to remarks of defense counsel who went outside record to refer to witness government failed to call). Here, defense counsel speculated on why the government did not call Harnish to testify. Defense counsel speculated that if Harnish's truthful testimony incriminated her and was thus favorable to the government, the government merely had to offer her immunity to get her to testify truthfully. Given defense counsel's speculation, it was fair reply for the prosecutor to speculate on why Harnish might not be helpful to the prosecution if called to testify.

In addition, the prosecutor had a good faith basis on which to speculate that Harnish might invoke her fifth amendment right if she took the stand. Prior to closing arguments, the prosecution told the court that, "as far as they knew" at the time, Harnish would not invoke her right against self-incrimination if called to testify. After rebuttal, the prosecutor explained to the court that Harnish did take the fifth amendment when initially called before the grand jury. At a later date, Harnish decided to talk but gave the prosecution a story it found to lack any credibility. Based on Harnish's past conduct, the prosecutor could in good faith believe that Harnish might lie or take the fifth amendment if called to testify. Since defense counsel invited the prosecutor to speculate on how Harnish might testify and that speculation was made in good faith, the prosecutor's comment about Harnish was neither improper nor unfairly prejudicial to the defendants.

For the foregoing reasons, the judgment of the district court is AFFIRMED.