**UNITED STATES of America**

v.

**Jeff Jerome MONTGOMERY, Defendant.**

**Crim. No. 92–0280–LFO.**

United States District Court,
District of Columbia.

March 1, 1993.

8

Brian M. Murtagh, Asst. U.S. Atty., Washington, DC, for U.S.

Penny Marshall, Asst. Federal Public Defender, Washington, DC, for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

A federal grand jury has returned, and the United States is prosecuting in federal court, an indictment that alleges that on June 21, 1992, within the District of Columbia, defendant, Jeff Jerome Montgomery, maliciously

damaged and attempted to destroy, by means of fire, the building located at 4301 Argyle Terrace, N.W., in Washington, and a 1992 Pontiac van garaged there, both of which were "used in activities affecting interstate commerce" [1] in violation of 18 U.S.Code § 844(i). The indictment also charges essentially the same conduct as a violation of D.C.Code §§ 22–401 and 403. Finally, the indictment charges that Montgomery violated D.C.Code § 22–403 on September 8, 1991, when he broke and destroyed "private property not his own, consisting of a window of a value of less than $200 located at 4301 Argyle Terrace N.W."

The defendant has entered a plea of not guilty and has given notice of possible reliance on the insanity defense. A magistrate judge ordered that the defendant be held without bond and that ruling was approved by Chief Judge Penn. In pretrial proceedings, the defendant has been adjudged competent to stand trial, but he is now confined at the District of Columbia's St. Elizabeth's Hospital. Elizabeth Teegarden, Ph.D., Chief of the Evaluation Unit of the Forensic Inpatient Services of the District of Columbia Commission on Mental Health Services, has filed a report that relates the opinions of two psychiatrists, Drs. Glenn Miller and Mitchell Hugonnet, that "Montgomery was suffering from paranoid delusions at the time of the instant offense in such a way that he was unable to appreciate the nature and quality or the wrongfulness of his actions." They diagnosed his disorders as delusional (paranoid) disorder, persecutory type, alcohol abuse, cannabis abuse, cocaine abuse, and personality disorder, NOS, with antisocial features. Meanwhile, both the prosecution and the defense have filed a number of motions, one of which is defendant's motion to dismiss the indictment for lack of federal jurisdiction.

The defendant's motion to dismiss will be granted effective March 8, 1993, because the United States has failed to carry its burden of establishing that the building and the van which were burned were used in

---

1. The indictment conspicuously fails to allege that either the building or the van was used "in commerce."

an activity affecting interstate commerce within the meaning of the Commerce Clause and 18 U.S.C. § 844(i), as construed in *Russell v. United States,* 471 U.S. 858, 859 & n. 4, 105 S.Ct. 2455, 2456 & n. 4, 85 L.Ed.2d 829 (1985). The brief *Russell* opinion cited with approval the statement in *Scarborough v. United States,* 431 U.S. 563, 571, 97 S.Ct. 1963, 1967, 52 L.Ed.2d 582 (1977), that:

> As we have previously observed, Congress is aware of the "distinction between legislation limited to activities 'in commerce' and an assertion of its full Commerce Clause power so as to cover all activity *substantially* affecting interstate commerce." (Emphasis added.)

In construing the clause and the statute, the *Russell* opinion further stated:

> In the floor debates on the final bill, although it was recognized that the coverage of the bill was extremely broad, the Committee Chairman, Representative Celler, expressed the opinion that "the mere bombing of a private home even under this bill would not be covered because of the question whether the Congress would have the authority under the Constitution." In sum, the legislative history suggests that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home.

*Russell,* 471 U.S. at 861, 105 S.Ct. at 2457 (citations omitted).

■ The *Russell* opinion leaves it to courts to draw on a case-by-case basis the line between those private homes (and, by necessary inference, those private vehicles) which are used in activities affecting interstate commerce and those which are not. Such ambiguity in a criminal statute requires construction of it in accordance with the principles of lenity. *See, e.g., United States v. Mennuti,* 639 F.2d 107, 113 (2d Cir.1981) (Friendly, J.).[2]

As then-Justice Rehnquist has observed with respect to "the broad dicta" with which the Supreme Court has described the reach of Congress' power to regulate pursuant to the Commerce Clause: "there *are* constitutional limits." *Hodel v. Virginia Surface Min. & Reclam. Ass'n.,* 452 U.S. 264, 309, 101 S.Ct. 2352, 2390, 69 L.Ed.2d 1 (1981) (concurring opinion). He reiterated the concern expressed by Chief Justice Hughes that the commerce power "not be extended so as to ... obliterate the distinction between what is national and what is local and create a completely centralized government." *Id.,* citing *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893 (1937). Finally, Justice Rehnquist stated:

> [I]t would be a mistake to conclude that Congress' power to regulate pursuant to the Commerce Clause is unlimited. Some activities may be so private or local in nature that they simply may not be *in* commerce. Nor is it sufficient that the person or activity reached have *some* nexus with interstate commerce. Our cases have consistently held that the regulated activity must have a *substantial* effect on interstate commerce.

*Hodel,* 452 U.S. at 310–11, 101 S.Ct. at 2391 (emphasis in original).

The construction of this essentially arson statute must also be informed by the constitutional concept of "Our Federalism."[3] The

---

2. The *Russell* opinion did not mention *Mennuti,* so it is appropriate to read the two cases together.

    The parties have not cited, and research has not disclosed, any relevant precedent in this circuit. Accordingly, any conflict between the more authoritative and better-reasoned opinions in *Russell* and *Mennuti* on the one hand, and the decisions of other courts of appeals, cannot be resolved at this level. *Compare, e.g., United States v. Stillwell,* 900 F.2d 1104 (7th Cir.1990); *United States v. Moran,* 845 F.2d 135, 138 (7th Cir.1988).

3. *See Younger v. Harris,* 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669 (1971) (Black, J.); *see also Harmelin v. Michigan,* —— U.S. ——, ——, 111 S.Ct. 2680, 2699, 115 L.Ed.2d 836 (1991) (Scalia, J.) (applying the concept of federalism in a criminal law context to preserve the diversity of policy that is "the very raison d'etre of our federal system"). *See generally* Panneton, *Federalizing Fires: The Evolving Federal Response to Arson Related Crimes,* 23 Am.Crim.L.Rev. 151, 206 (1985); Stern, *The Commerce Clause Revisited—The Federalization of Interstate Crime,* 15 Ariz.L.Rev. 271 (1973); Ruff, *Federal Prosecution of Local Corruption: A Case Study in the Making*

crime of arson, which the prosecution would federalize here, is the same common law crime, *see* 2 Blackstone's Commentaries *220, that is punishable in the District of Columbia by a sentence of up to ten years, D.C.Code § 22–403. Thus, Judge Friendly invoked

> the Supreme Court's admonitions that "ambiguity" concerning the ambit of criminal statutes should be resolved in the favor of lenity, *Rewis v. United States*, 401 U.S. 808, 812[, 91 S.Ct. 1056, 1059, 28 L.Ed.2d 493] . . . (1971) and that "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definitive." [citations omitted] Moreover, . . . "unless Congress conveys its purpose clearly, it will not be deemed to have changed the federal-state balance" in the prosecution of crimes.

*Mennuti*, 639 F.2d at 113.

The simple facts set out in the compact *Russell* opinion further inform, in the context of criminal law, the broad, but not unlimited, reach of section 844(i) to private residences and, by reasonable inference, to private vehicles. *Russell* owned an urban building which housed residential apartments. He let the apartments for rent, and made his home elsewhere. In a scheme to defraud the carrier of fire insurance on the building, he hired a convicted felon to set it on fire. The "torch" attempted to carry out his nefarious mission by igniting a pipe which carried natural gas into this residential apartment building. The attempt failed and he turned Russell in to the FBI instead of making the second attempt requested. The Supreme Court concluded, as a matter of law, that the rental of real estate is "unquestionably" an activity that affects commerce. Said the Court:

> [T]he local rental market of an apartment unit is merely an element of a much broader commercial market in rental properties.

The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class.

> The petitioner was renting his apartment building to tenants *at the time* [[4] he attempted to destroy it by fire. The property was therefore used in an activity affecting commerce within the meaning of the Act.

*Id.* 471 U.S. at 862, 105 S.Ct. at 2457.

The contrast between the simple facts of *Russell* and the prosecutor's proffer here (a copy of which is attached) is striking. Judge and Mrs. Mize own and occupy a private home in the District of Columbia and regularly park their van in an attached garage. When the garage and van were burned, Judge Mize was not engaged in any activity affecting interstate commerce, substantially or otherwise. *See United States v. Monholland*, 607 F.2d 1311, 1315 (10th Cir.1979) (statute not applicable to burning of state judge's truck used for transportation to and from work but with no "real relationship to commerce").

Viewing Mrs. Mize's activity, as proffered by the prosecution, in perspective and in light of the principle of lenity, it is apparent that only a minor preparatory fraction of her nurse training activity occurred in the family home. Nor does her infrequent use of the family van primarily for occasional shopping in the Washington suburbs and one trip to a nurse-training seminar in Williamsburg, Virginia, constitute use of the van in an activity affecting interstate commerce within the meaning of this criminal statute and the Commerce Clause, as fairly construed in light of *Russell* and *Mennuti*.

If Mrs. Mize's part-time, $5500–per–year job in nurse training is, in any sense, "commerce," it is not of a kind or magnitude which federal law and the federal courts have regulated civilly, except in the most limited

---

*of Law Enforcement Policy*, 65 Geo.L.J. 1171, 1172 (1977).

**4.** There is nothing in the prosecution's proffer that Mrs. Mize, the only member of the family

even arguably engaged in an activity affecting commerce, was in the family home at the time the garage and van were burned.

and tangential ways. Congress may very well have acted with restraint in such situations to minimize the Commerce Clause problems such as those which lurk here. *See, e.g., Independent Ladies' Garment Workers' Union v. Donovan,* 722 F.2d 795 (D.C.Cir.1983) (piece work in home is prohibited in certain industries to facilitate enforcement of minimum wage law obligations of an employer engaged in demonstrably interstate commerce business); *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 247, 85 S.Ct. 348, 352, 13 L.Ed.2d 258 (section 201(b)(1) exempts from the federal public accommodations law "any inn, hotel, motel, or other establishment ... which contain not more than five rooms for rent or hire and which is actually occupied by the proprietor of such establishment as his residence").

■ But this is a criminal prosecution, attempting to apply a federal criminal statute to a garden variety arson such as has been traditionally and severely punishable in a local court pursuant to local law.[5] In this criminal case, it is appropriate to construe both the Commerce Clause and Section 844(i) with restraint and according to the principle of lenity. Application of that principle leads to the conclusion that Congress was not authorized by the Commerce Clause, and, in any event, has not stated with sufficient clarity an intent, to federalize a residential arson case like this. In particular, the *Russell* facts do not establish a precedent for applying section 844(i) to the potpourri strung together in the prosecution's proffer here.[6] If the proffered facts can prove a federal crime within the meaning of the Commerce Clause and section 844(i) as construed in *Russell* and *Mennuti,* it is difficult to imagine any rational and manageable limit on the application of that statute to an urban (or suburban) home, or a vehicle garaged there, particularly in communities like Kansas City, Missouri/Kansas and the metropolitan areas of New York and Washington.

In sum, it is inconceivable that the Framers of the Commerce Clause or even the Congress that approved Section 844(i) contemplated that such a statute (originally aimed at protecting from attack by terrorists and racketeers property substantially used in genuine interstate commercial activity) would be applied to convert into enclaves protected by federal criminal law every private home occupied, and every vehicle used, for example, by the hundreds of thousands who work in a metropolitan area like Washington, do a modicum amount of work at home, and drive privately owned vehicles back and forth across the District line in the course of their daily routine.

■ There remain for consideration counts 3, 4, and 5 alleging violations of District of Columbia law. These are pendent charges. Jurisdiction is authorized under D.C.Code § 11–502(3) and is a matter of discretion. *United States v. Kember,* 685 F.2d 451, 454–55 (D.C.Cir.1982) (federal court has discretion to retain case where retention is warranted by remaining matters of federal concern and judicial economy); *United States v. Kember,* 648 F.2d 1354, 1359 (D.C.Cir.1980) (federal jurisdiction over offenses under District of Columbia law is appropriate in some cases even after disposition of federal offenses is reached). On this eve of trial with all the preparation that has taken place, it would be an abuse of discretion to dismiss the District of Columbia

---

**5.** Furthermore, if, as is entirely possible, Montgomery should be found not guilty by reason of insanity, his commitment at St. Elizabeth's facility under the supervision of the District of Columbia and its courts may be at least as appropriate as sending him to a distant and more elaborate mental institution operated by the Federal Bureau of Prisons.

**6.** The proffer recites the following particulars, among others, as evidence of interstate commerce activity actionable under section 844(i) and the Commerce Clause: magazine subscriptions delivered to the Mizes' home; their use of computer software manufactured by IBM in Armonk, New York; the mailing of an $80 check to California for Mrs. Mize's nursing board certification; the supply of natural gas, insurance on the house and van, and financing for the home from sources outside the District; the employment of a housekeeper during the week, including the provision of room and board for her and the fact that she "regularly sends a portion of her salary back to Chile"; and Mrs. Mize's part-time, $5500–per–year job in nurse training as an "independent contractor" for Mosby Year Book Inc.; not to mention the use of their van for shopping trips to Freshfields of Bethesda.

counts. Accordingly, the accompanying Order will dismiss counts 1 and 2. Counts 3, 4, and 5 will be tried as scheduled.

## APPENDIX

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

JEFF JEROME MONTGOMERY

Filed Nov. 30, 1992.

GOVERNMENT'S RESPONSE TO MOTION TO DISMISS INDICTMENT FOR LACK OF FEDERAL JURISDICTION

### FACTUAL PROFFER

The evidence which the Government will seek to introduce at trial will establish that on the night of June 21, 1992, the Mize residence located at 4301 Argyle Terrace N.W. was seriously damaged by arson.[1] In addition the Mize's 1992 Pontiac Trans Sport SE Van (the van) that was parked in the driveway, was destroyed by arson, when it was doused with gasoline and ignited. The defendant is charged with the commission of these acts involving the house and the van in Counts One and Two of the Indictment respectively, which allege violations of the federal arson statute in violation of 18 U.S.C. 844(i).

### THE BUILDING

The building located at 4301 Argyle Terrace N.W. in the District of Columbia is occupied by Judge Gregory Mize, his wife Marisa, their four children and a housekeeper who resides with the family during the week.

[1]. This factual proffer is based upon the anticipated testimony of witnesses and the introduction of documentary evidence.

[2]. Contrary to the defendant's unsupported premise, that the materials required for her presentations are not prepared by her in the building (Motion p. 6), Mrs. Mize does in fact conduct this activity in the building.

Mrs. Marisa Mize is a Registered Nurse who is licensed by the State of California and the District of Columbia, and who practices in the field of pediatric critical care. Mrs. Mize is further employed in the building, and elsewhere, as an independent contractor by Mosby Year Book Inc. (Mosby), of Saint Louis, Missouri, to participate in Mosby's Nursing Board Review business as an educator. Since 1990, Mrs. Mize has treated this commercial activity conducted in the building as a business for federal income tax purposes. (App. pp. 1–5).

As a leading publisher of nursing texts, references, and review tools used by candidates preparing for licensing examinations, Mosby sponsors seminars throughout the United States, and in Canada. Prior to June 21, 1992, Mrs. Mize was contracted by Mosby, through its subsidiary Resource Applications Inc. of Hanover, Maryland, to prepare, review and edit instructional materials, including course outlines, visual presentations using slides and overhead transparencies, for these seminars, to furnish the materials after preparation, review or editing, to Resource Applications for reproduction and distribution, and to travel to various locations in the United States (e.g. Williamsburg, Virginia) and Canada (e.g. Calgary, Alberta) to conduct the seminars.

In all but the instances in which she actually travels in interstate and foreign commerce to conduct the nursing seminars, Mrs. Mize engages in preparation, review, editing, administrative and professional activities, incident to this commercial activity, in the building, which affect interstate commerce.[2]

In 1991 Mosby filed an IRS Form 1099 "Miscellaneous Income" for Mrs. Mize in the amount of $5550.00. (App. p. 3). Mrs. Mize reported that income to the IRS by filing a Form Schedule C ("Profit or Loss From Business") as part of her 1991 tax return. (App. p. 1).[3]

[3]. Defendant's assertion that because the Schedule C's filed by the Mize's do not reflect any deductions for the use of the building, and that this is fatal to the building being used in an activity affecting interstate commerce, is wrong. The IRS Instructions for the Schedule C expressly provide that in order to claim an expense for the use of a portion of a residence it must be

In order to maintain her eligibility as an educator in the field of nursing, Mrs. Mize maintains her Board Certification in Nursing, by the State of California, which requires the payment of a biannual fee of $80.00. The fee was paid by check mailed to the California State Board of License Renewal in Sacramento, California.

To maintain her proficiency in developments occurring in nursing, Mrs. Mize subscribes to various professional journals including: *Focus On Critical Care.* published by Mosby Year Book, Saint Louis Missouri; *American Journal of Critical Care,* both published by the American Association of Critical Care Nurses (AACN), of Aliso Viejo, California (App. p. 178, 180); *HEARTBEAT,* published by the American Heart Association, Chicago, Illinois, (App. p. 179); *Maternal Child,* published by the American Journal of Nursing, New York; *Image,* published by the Journal of Nursing Scholarship, Indianapolis, Indiana, (App. p. 181).

These, and other subscriptions and memberships fees for Mrs. Mize are all paid for by checks prepared at the building, which are cleared through interstate banking channels. (App. pp. 142–153) The journals are all delivered to the building by the U.S. Postal Service, where they are maintained for reference. (App. pp. 178–81)

Mrs. Mize further maintains her professional credentials by attending various nursing training courses such as the National Teaching Institute which was given in Boston, in 1991. In addition Mrs. Mize maintains her certification in advanced cardiac life support (ACS), by being recertified every eighteen months, at Fairfax City, Virginia.

The typical sequence of events in a seminar sponsored by Mosby, in which Mrs. Mize participated, is illustrated by the Pediatric Nursing Conference between June 15–19, 1992 at Williamsburg, Virginia. On January 16, 1992, a letter contract was mailed to Mrs. Mize at 4301 Argyle Terrace N.W. (the building) from Resource Applications in Hanover, Maryland, to confirm her agreement to participate in the Pediatric Nursing conference in Williamsburg.[4] (App. p. 40). On February 5, 1992, Mrs. Mize executed the contract at the building and returned it by U.S. Mail to Resource Applications. (App. p. 41) Pursuant to the contract, Mrs. Mize was required to prepare and submit a topical outline and handout materials by May 4, 1992. (App. p. 40). Mrs. Mize prepared the required materials in the building using an IBM personal computer, manufactured by IBM, Armonk, New York, which was programmed with WordPerfect software, supplied by WordPerfect Corporation of Orem, Utah. (App. pp. 195–96) The course materials were sent by U.S. Mail to Resource Applications in Hanover, Maryland, for review, duplication, and eventual transportation to the conference site at Williamsburg, Virginia.

On June 16, 1992, Mrs. Mize drove from the building to the conference site in Williamsburg, in the Pontiac Trans Sport Van, which is also the subject of Count Two. (App. p. 27–30). On June 17, 1992 Mrs. Mize drove back to Washington in the van. (Id.) On June 18, 1992, Mrs. Mize prepared an expense voucher in the building in order to obtain reimbursement from Resource Applications for mileage and food expenses. (App. p. 30). On June 19, 1992, Mosby Year Book/Resource Applications mailed a check to Mrs. Mize for $400, which constituted the honorarium for the conference. (App. p. 26).

---

used *exclusively* for that purpose. See App. p. 188) Neither the language, legislative history, nor decisions of the courts of appeal concerning Section 844(i) require that the building be used *exclusively* in an activity affecting interstate commerce. See *United States v. Moran,* 845 F.2d 135, 137 (7th Cir.1988) "The stipulated facts clearly establish that through the use of the business computer for business purposes and the interstate telephone calls, the *residence was used in part for commercial purposes.* This commercial activity readily distinguishes *Mennuti.*"

**4.** All communications to Resource Applications from Mrs. Mize are conducted either by interstate phone call using the MCI long distance service maintained at the building, by U.S. Mail. Communications from Resource Applications, are conducted either by interstate phone call, by U.S. Mail or by Federal Express, addressed to Mrs. Mize at 4301 Argyle Terrace, N.W., Washington, D.C.

On July 17, 1992 Resource Applications mailed Mrs. Mize a second check as reimbursement for mileage to and from Williamsburg, Virginia, and other incidental expenses. (App. p. 38) Both checks were drawn on Mosby's account at Citibank–Delaware, New Castle, Delaware.

With the exception of the use of commercial airline facilities, a similar sequence of events occurred in connection with Mrs. Mize's participation in the course on critical pediatric care which was presented in Calgary, Canada between June 3–6, 1992. (App. pp. 12–24). (For additional expense vouchers processed by Resource Applications/Mosby Year Book See App. 189–90.)

In addition to the nurse/educator consulting business which Mrs. Mize conducts, the building is used in other commercial activities affecting interstate and foreign commerce, which provide an independent basis for federal jurisdiction. This is due to the fact that since April, 1992, the Mize's have employed a housekeeper who resides with them from Monday to Friday, but who returns to Virginia each weekend[5].

As part of her employment at the Mize residence the housekeeper is provided with room and board, in addition to a salary which is paid in cash. As they did for the 1991 tax year involving a previous housekeeper, the Mize's will file for the 1992 tax year, an IRS Form 2441 Child and Dependent Care Expenses reflecting these employee expenses.

As employers of the housekeeper, the Mize's are required to, and have filed an IRS Form 942—Employer's Quarterly Tax Return For Household Employees. (App. p. 176) For this purpose they have been issued a Federal Employer's Identification Number (EIN). Id. The payments are made by check to the IRS in Philadelphia and the end of each calendar quarter, including the one in which the arson took place. Id.

As far as the Government of the District of Columbia is concerned, and with the approval of Congress, the Mize's are engaged in "a business" by virtue of the fact that they employ one employee at 4301 Argyle Terrace N.W., and consequently they are required by Title 36, Section 334 of the District of Columbia Code (D.C.C.) to obtain Worker's Compensation for the housekeeper. (App. pp. 154–55) Failure to obtain this insurance coverage is punishable under Title 36, Section 339 (App. p. 157) by fine of up to $10,000.00.

The Mize's complied with their legal obligations as employers engaged in a business employing at least one person, by obtaining a Workers Compensation And Employers Liability Insurance Policy, from the Continental Insurance Company, Cranbury, New Jersey, through insurance brokers Early, Cassidy and Schilling, of Bethesda, Maryland. (App. pp. 154, 159–171). The policy was in force at the time of the arson. Id.

As in the federal context, the Mize's are required to file, and did file during the relevant quarter, employee wage information for the housekeeper. (App. p. 175)

The housekeeper's employment duties, which are performed in the building, include meal preparation involving the use of staples (i.e. meat, butter, eggs, milk, cereals, rice, coffee,) which have been produced outside the District of Columbia, or in the case of items purchased by the Mize's at Freshfields of Bethesda (i.e. fruits, juices, vegetables) actually transported in interstate commerce by the Mize's. Some of the meals are cooked by the housekeeper using a stove that burns natural gas obtained from interstate commerce.

As a further part of her employment agreement with the Mize's, the housekeeper's health insurance premiums for Kaiser Permanente California corporation) are paid in part for her. When the housekeeper wishes to see a doctor she travels in interstate commerce to the Kaiser Permanente facilities located in Virginia.

The commercial activity of employing the housekeeper at 4301 Argyle Terrace, N.W., further affects interstate and foreign com-

---

5. For example, the housekeeper had traveled into the District of Columbia from Virginia to return to work on the day of the arson, Sunday June 21, 1992.

merce, in that the housekeeper, who is a native of Chile, regularly sends a portion of her salary back to Chile. This is effected by the transportation of a portion of her wages to Virginia, which is then consolidated with other monies from relatives living there, and wired back to Chile by Western Union.

In addition to the activities described above, the building is used in other activities affecting interstate commerce, such as real estate mortgage financing, hazard insurance, and consumption of natural gas which has been transported in the facilities of interstate commerce. These activities are incident to both the consulting business conducted by Mrs. Mize, and the employment of the housekeeper. Consequently, and as is explained *infra*, these links to interstate commerce should not be viewed singularly for jurisdictional purposes, but rather in combination with each other, and incidental to each of the commercial activities described *supra*.

At the time of the fire, the mortgage payments for 4301 Argyle Terrace N.W. were made to Maryland National Mortgage Corporation in Baltimore, Maryland, which merged with the holders of the original deed of Trust. (App., p. 68).

The building was insured by Fireman's Fund of Bethlehem, Pennsylvania, based upon a policy which had been produced by Early, Cassidy & Schilling, independent insurance agents, of Bethesda, Maryland. (App. pp. 69–75).[6] As a direct result of the arson involving the building, a claim ("Proof of Loss") was submitted by the Mizes to

Fireman's Fund Insurance Company of Novato, California. (App. pp. 76–77). The claim was handled by Fireman's Fund of Greensboro, North Carolina, which employed the services of an adjuster located in Fairfax, Virginia. (App., pp. 87–88). Fireman's Fund paid claims for the fire damage to the building by checks drawn on the First Union National Bank of Chapel Hill, North Carolina. (App. pp. 80–83)[7]. Fireman's Fund also paid $3,333.07 to the Mizes for the cleaning of smoke damage to the building, which was performed by Servicemaster, of Chantilly, Virginia. (App. pp. 80–81, 88–97).

Lastly, during the relevant time period, the building was supplied with natural gas for heating and cooking purposes by the Washington Gas Light Company. (App. pp. 100–01). According to *Gas Facts*, compiled by the American Gas Association no natural gas is produced in the District of Columbia. (App. pp. 98–99). Indeed, the Annual Report filed with the SEC by Washington Gas Light Company pursuant to the Securities Exchange Act of 1934, reflects, that of the six methods of supply of natural gas utilized by the company, none of them originate in the District of Columbia. (App., pp. 102–104).

## THE VAN

The 1992 Pontiac Trans Sport SE, which is the subject of Count Two of the Indictment, 1992, was manufactured in the State of Michigan, ordered in late 1991 from Ridge Motors, in Des Plaines, Illinois, and shipped from there to Bill Cairns Pontiac–Buick, of Marlow Heights, Maryland in November 1991. (App. p. 173). The van was driven

---

6. The defendant's reliance on *United States v. Voss*, 787 F.2d 393 (8th Cir.1986) for the proposition that insurance obtained out of state is never sufficient as a matter of law to show an activity affecting interstate commerce (Motion p. 4) is incorrect. As we explain *infra* at pp. 21–23 the holding in *Voss*, *supra*, is limited by the factual context of the erroneous jury instruction in that case. Furthermore, the government does not rely on each distinct link to interstate commerce standing alone, but rather in combination with each other, and incidental to each of the two commercial activities conducted in the building. See *United States v. Barton*, *infra*.

7. The actual repairs to the building were made by Jarman Construction Company, which served as the prime contractor. (App. p. 88). Jarman subcontracted with Certified Roofing Systems and Contracting Corp., Bladensburg, Maryland, for the replacement of the existing copper roof over the garage beneath the living quarters. (App. p. 137) Jarman obtained the replacement garage doors from Overhead Door Company of Washington D.C., which is located in Beltsville, Maryland. (App. p. 138).

**16**

into the District of Columbia from Maryland, where it was registered on December 10, 1991. (App. p. 135)

As described above, prior to its destruction by arson, the van was used by Mrs. Mize to travel from Washington, D.C. to Williamsburg, Virginia, and return, in connection with her nurse/educator business.[8] The van was also routinely used in interstate commerce by Mrs. Mize to drive to Freshfields, a grocery store located in Bethesda, Maryland.[9] (App., pp. 191–94)

The van was insured by Government Employees Insurance Company (GEICO), which the evidence will show, that notwithstanding its Washington, D.C. Zip Code, is physically located in the State of Maryland. (App., pp. 106–109). Following the fire, the van was towed to a storage facility by Raley's Towing, of Capitol Heights, Maryland. (App., p. 105). A claim was filed by the Mize's for the destruction of the van which GEICO ultimately settled for $19,534.00, payable by draft mailed from Maryland to 4301 Argyle Terrace N.W., Washington, D.C. (App., pp. 119–130).

The immediate impact on interstate commerce of the destruction of the van on June 21, 1992 was that Mrs. Mize was without transportation to get to the nursing seminar in Baltimore which she was to conduct on June 25–26, 1992. Consequently, Resource Applications, Hanover, Maryland, hired a car and driver from Carey Limosine, Arlington Virginia, to take Mrs. Mize to and from Baltimore, Maryland.

The subsequent impact on interstate commerce was caused by the need to replace the van. This was done by purchasing an identical model in the same fashion as the one destroyed by the arson.

---

Respectfully submitted,
JAY B. STEPHENS
United States Attorney
/s/ Brian M. Murtagh
By: BRIAN M. MURTAGH
Assistant United States Attorney
U.S. Attorney's Office, 5th Fl.
Transnational/Major Crimes Unit
555 4th Street, N.W.
Washington, D.C. 20001
(202) 514-7304
D.C. Bar No. 108480

---

**8.** Defendant seems to argue that the evidence does not show extensive use of the van by Mrs. Mize for her business trips. (Motion pp. 6–7). There is a very simple reason for that fact: the defendant destroyed the van by arson when it was virtually brand new.

**9.** Defendant concedes (Motion p. 7) that the van was used for shopping, but fails to grasp that when the shopping involves crossing state lines, that the van is being … "used in, and in an activity affecting interstate commerce." Defendant further fails to appreciate that the use of the van for interstate shopping provides an independent basis for the exercise of federal jurisdiction.