**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ralph RAMEY, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**James "Bo" PAYNE, Defendant–Appellant.**

Nos. 93–5178, 93–5194.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 11, 1994.

Decided May 17, 1994.

---

**ARGUED:** Nathan A. Hicks, Jr., Charleston, WV, for appellant Payne; Marc Philippe Turgeon, Charleston, WV, for appellant Ramey. Thomas Evans Chandler, Civ. Rights Div., U.S. Dept. of Justice, Washington, DC, for appellee. **ON BRIEF:** James P. Turner, Acting Asst. Atty. Gen., Dennis J. Dimsey, Civ. Rights Div., U.S. Dept. of Justice, Washington, DC, for appellee.

Before HALL and MICHAEL, Circuit Judges, and OSTEEN, United States District Judge for the Middle District of North Carolina, sitting by designation.

Affirmed by published opinion. Judge K.K. HALL wrote the majority opinion, in which Judge OSTEEN joined. Judge MICHAEL wrote an opinion concurring in part and dissenting in part.

### OPINION

K.K. HALL, Circuit Judge:

James "Bo" Payne and Ralph Ramey appeal their convictions and sentences for various offenses arising from the arson of the residence of an interracial couple. We affirm.

### I.

On June 3, 1990, at 10:30 p.m., an arsonist or arsonists burned down a mobile home occupied by JoAnn Vance and Alex Nelms at Pecks Mill in Logan County, West Virginia. Vance is white; Nelms is black.

Nearly two full years later, James "Bo" Payne and Ralph Ramey were indicted by a

federal grand jury in connection with the burning of the trailer. They were charged with (I) conspiracy to deprive Vance and Nelms of their civil rights, in violation of 18 U.S.C. § 241; (II) willful interference with fair housing rights, in violation of 42 U.S.C. § 3631(a); (III) use of fire in the commission of a felony, in violation of 18 U.S.C. § 844(h)(1); and (IV) arson of a building used in an activity affecting commerce, in violation of 18 U.S.C. § 844(i). Both filed motions for separate trials,[1] which the district court denied.

A six-day trial was held in November, 1992. Vance testified that she was in bed when she heard an object strike the trailer and a liquid splash. She looked out of the window and saw flames. She and Nelms ran outside and tried to put the fire out. They were unsuccessful; the trailer burned to the ground.

An assistant state fire marshal testified that the fire was deliberately set in three places, and an inflammable liquid was used as an accelerant.

Ramey lives nearby, and Payne's mother lives across the road from the trailer. Various witnesses testified that, prior to the fire, both Ramey and Payne had made many derogatory statements about blacks in general and their hatred of Vance and Nelms in particular. Ramey told his own father-in-law that somebody should "burn out" Vance and Nelms because he did not like the idea of a white woman living with a black man. Ramey's sister-in-law related similar remarks. According to his friend Gilmer Mister, Payne had predicted that someone could throw a firebomb through the trailer and get away with it.

On the day of the fire, Ramey, Payne, and others met at Jerry Green's house up the hollow from the Vance/Nelms trailer. They spent the day drinking beer. Later, Green, Ramey, and Payne went riding around in Green's car. Payne asked Green to stop at Payne's sister's house. Payne went in and asked to borrow a gallon of gasoline. His brother-in-law, Delbert White, gave him some gasoline in a plastic jug. Payne put the jug in Green's car, and they drove off. As they neared the Vance/Nelms trailer, Payne told Green to stop. Payne and Ramey got out, with Ramey boasting to Green that they were going "to burn the niggers out." Green testified that he was "frightened" by this revelation, and he "went home as fast as [he] could."

Payne's mother saw the two get out of Green's car. They came over to her porch, where they spoke briefly with her. She then went to bed. Soon she heard a loud noise, looked out, and saw the trailer on fire. She saw her son and Ramey (her son was inside her trailer, she said at trial), and she asked her son to go help Vance, which he did.

Other neighbors, Phillip and Kimberly Deskins, went to Vance's aid. Mr. Deskins saw two men standing on the bank behind the trailer, one of whom he recognized as Payne.

After the fire, Payne and Ramey reappeared at Green's house. Both Green and his mother testified that they smelled gasoline on Ramey's pants, and his boots were soaked with some sort of liquid. Green's mother gave Ramey dry pants, and he washed his pants and boots in her washing machine.

In the ensuing days and months, Ramey boasted about his deed. He told his sister-in-law, his ex-wife's cousin, and his stepdaughter that he had burned the trailer. About six months after the fire, he asked Gilmer Mister to relate his prowess to some persons riding in his car: "Tell these boys that they don't want to mess with me ... cause I took care of the nigger, didn't I." Chris Cox asked Ramey if he had burned the trailer, to which Ramey responded with a laugh. Bob Thomas (Ramey's father-in-law) asked Payne a similar question, and got a grin for his answer.

Both Payne and Ramey testified at trial, and each blamed the other. Ramey said that he simply stood at Payne's mother's trailer and watched Payne set the fire. Payne, on the other hand, claimed that he was in the bathroom at his mother's when he heard a

---

**1.** Payne renewed his motion during the trial itself.

loud crash; Ramey later confessed to him that he had set the fire.

The jury convicted Ramey and Payne on all counts. Ramey was sentenced to 108 months, and Payne to 96, on counts I, II, and IV. Both received a 60–month consecutive sentence on count III and three years of supervised release. Finally, the court ordered restitution in the amount of $10,766.97, for which Ramey and Payne are liable jointly and severally.

Ramey and Payne appeal.

## II.

The defendants challenge their arson convictions because, they assert, destruction of the Vance/Nelms trailer is beyond the reach of the Congress' power to regulate interstate commerce.

### A.

■■■ The Commerce Clause [2] literally gives Congress only the power to "regulate" interstate and foreign commerce, though, like all other enumerated congressional powers, it is freed from the potential straitjacket of its literal terms by the Necessary and Proper Clause.[3] Congress may regulate non-commercial activities that merely "affect" interstate commerce, so long as the class of activities regulated has an effect on commerce in the aggregate, and notwithstanding that any single instance of the activity has only a trivial or theoretical effect. *E.g., Wickard v.*

*Filburn,* 317 U.S. 111, 127–128, 63 S.Ct. 82, 90–91, 87 L.Ed. 122 (1942) (farmer's growing wheat for his own consumption "affects" commerce, because farmer is able to avoid buying wheat in the marketplace). Moreover, the Court does not inquire beyond whether Congress had "any rational basis" for believing that commerce was affected. *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 258, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964). Finally, if Congress *can* act through the Commerce Clause, it *may* act, whatever its true motive for the legislation. *Id.,* 379 U.S. at 257, 85 S.Ct. at 357–58; *Mulford v. Smith,* 307 U.S. 38, 48, 59 S.Ct. 648, 652, 83 L.Ed. 1092 (1939); *Weber v. Freed,* 239 U.S. 325, 330, 36 S.Ct. 131, 132, 60 L.Ed. 308 (1915). As a practical matter, at least since the watershed decisions of 1937–1942,[4] the political process, and not the courts, has been the states' only real defense against commerce-based federal incursions.[5] With this nearly boundless background in mind, we turn to the particular statute at issue here.

### B.

■■■ In 18 U.S.C. § 844(i), Congress prohibited the arson of any building used in an activity that affects commerce. The language of § 844(i) is intended to and does exercise Congress' power to its constitutional limit. *Russell v. United States,* 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985).

---

2. U.S. Const., art. I, § 8, cl. 3.

3. U.S. Const., art. I, § 8, cl. 18, giving Congress power "[t]o make all Laws which shall be necessary and proper for carrying into execution the foregoing Powers...."

4. *See NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (upholding Wagner Act); *United States v. Darby,* 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941) (upholding prohibition on transportation in interstate commerce of products manufactured with child labor); *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 62 S.Ct. 523, 86 L.Ed. 726 (1942) (upholding regulation of sales of intrastate milk because such sales compete with "interstate" milk); *Wickard,* 317 U.S. 111, 63 S.Ct. 82.

5. *See Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 549–551, 105 S.Ct. 1005, 1016–18, 83 L.Ed.2d 1016 (1985) (Commerce Clause is not measured by "freestanding conceptions of state sovereignty"; states' interests are protected by the structure of the federal system and their ability to participate in it). This idea is not new. In *Gibbons v. Ogden,* 22 U.S. (9 Wheat.) 1, 197, 6 L.Ed. 23 (1824), Chief Justice Marshall remarked,

> The wisdom and the discretion of Congress, their identity with the people, and the influence which their constituents possess at elections, are, in this, as in many other instances, as that, for example, of declaring war, the sole restraints on which they have relied, to secure them from [the Commerce Clause's] abuse. They are the restraints on which the people must often rely solely, in all representative governments.

*Russell* involved rental property, so the Supreme Court had no problem arriving at a quick and unanimous result—"all business property" is within the reach of the commerce power. The Court speculated, however, that § 844(i) might not protect "every private home." *Id.* at 861–862, 105 S.Ct. at 2457.

*Russell* implicitly rejected the rationale of a Second Circuit case relied on by the appellants. In *United States v. Mennuti*, 639 F.2d 107 (2nd Cir.1981), the court held that § 844(i) did not apply to property that was not used for a commercial purpose. Of course, the commerce power is far broader than that, and *Russell*'s holding that the full commerce power is exercised in § 844(i) saps *Mennuti* of any vigor.

On the other hand, there are not many cases applying § 844(i) to private dwellings, perhaps because federal prosecutors do not routinely choose to prosecute arsons without some independent basis for federal interest, such as the civil rights violations prosecuted here. The Seventh Circuit has taken the lead in *United States v. Stillwell*, 900 F.2d 1104 (7th Cir.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 111, 112 L.Ed.2d 81 (1990), where it held that receipt of natural gas that has traveled in interstate commerce is enough. This circuit, like most, has never had to address application of § 844(i) to non-business property, *e.g., United States v. Parsons*, 993 F.2d 38, 40 n. 3 (4th Cir.) (single family dwelling used as rental property affects commerce, so court does not have to decide what circumstances might bring a private residence within the statute), *cert. denied*, —— U.S. ——, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993), and it is not particularly surprising that the circuits strain to find some "business" nexus to avoid the perhaps jarring application of the commerce power at its outermost extent. *See United States v. Shively*, 927 F.2d 804, 808 (5th Cir.) (house

and automobile had "some relationship" to their owner's trucking business), *cert. denied*, —— U.S. ——, 111 S.Ct. 2806, 115 L.Ed.2d 979 (1991); *United States v. Mayberry*, 896 F.2d 1117, 1120 (8th Cir.1990) (sawmill that had been closed for thirty days had not yet lost its commercial character); *United States v. Moran*, 845 F.2d 135, 137–138 (7th Cir.1988) (use of computer owned by business and making interstate phone calls for business purposes enough to establish commercial activity).[6]

The Vance/Nelms trailer had been manufactured in North Carolina, but had been stationary at Pecks Mill for sixteen years. It receives electricity, as well, from an interstate power grid. Do these facts constitute "uses" in an "activity" that affects commerce? We think the second of the two is the clincher.[7] Though the trailer doubtless consumed but a pittance of energy from the power company's grid, its consumption, combined with that of all similarly situated buildings, has a most definite effect on interstate commerce. The class of activities not only "affects" commerce, but is in fact the raison d'etre of an interstate business. Congress has the power to protect this commerce from destruction by fire.

### III.

The defendants challenge the sufficiency of the evidence to sustain the convictions. We cannot disturb the verdicts if, considering the evidence in a light most favorable to the government, we conclude that any rational trier of fact could have found that the elements of the crime had been proved beyond a reasonable doubt. *United States v. Vogt*, 910 F.2d 1184, 1193 (4th Cir. 1990), *cert. denied* 498 U.S. 1083, 111 S.Ct. 955, 112 L.Ed.2d 1043 (1991); *see Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Ramey and

---

**6.** In *United States v. Ryan*, 9 F.3d 660, 666 (8th Cir.1993), *vacated, rehearing en banc granted*, 1994 U.S.App. LEXIS 140 (8th Cir.1994), a case involving business property, the court recognized that "receipt and use of natural gas from across state borders is an activity directly affecting interstate commerce." However, the court implied in dicta that this direct effect on interstate commerce would not be in and of itself enough

to support a § 844(i) conviction by purporting to "refuse to extend" its decision to a privately owned home used "solely for residential purposes."

**7.** The statute requires a "use" in an "activity" that affects commerce. We do not decide whether prior movement in commerce is such a "use."

Payne invite us to ignore many reasonable inculpatory inferences and to find the testimony of many government witnesses incredible. We would invade the province of the jury if we did either. *Glasser v. United States,* 315 U.S. 60, 77, 62 S.Ct. 457, 468, 86 L.Ed. 680 (1942). The evidence was sufficient.

### IV.

■■■ Payne twice moved for a separate trial, and the district court denied both motions. Joint trials are "highly favored in conspiracy cases," and severance is committed to the district court's discretion. *United States v. Tedder,* 801 F.2d 1437, 1450 (4th Cir.1986), *cert. denied,* 480 U.S. 938, 107 S.Ct. 1585, 94 L.Ed.2d 775 (1987). Payne says that the evidence against Ramey was much stronger than against him, but disparity in evidence is only very rarely a proper ground for severance. *United States v. Mitchell,* 733 F.2d 327, 331 (4th Cir.), *cert. denied,* 469 U.S. 1039, 105 S.Ct. 520, 83 L.Ed.2d 409 (1984). There was plenty of evidence implicating Payne, in any event.

■■■ Payne also distorts the holding of *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), into a rule that a codefendant's testimony always has an unduly prejudicial effect on the other defendant. *Bruton* dealt only with the Confrontation Clause problem of admitting the out-of-court confession of a nontestifying codefendant. Here, both defendants testified and were cross-examined by one another. *Bruton* has no relevance.

There was no abuse of discretion in the denial of Payne's motions for a separate trial.

### V.

■■■ Ramey's lawyer, Marc Turgeon, asked Linda Hughes, Ramey's former step-daughter, whether she had ever made any sort of accusation against Ramey. He apparently knew[8] what the answer would be: she had caught Ramey molesting her little sister Velma. Turgeon proceeded to drive the point home by asking Linda over and over about the details, which she dutifully related. She did not break down under cross-examination and admit that she was lying.

Turgeon then tried to introduce extrinsic evidence that supposedly showed that the molestation charge was a lie. He called a state police officer and state foster care worker to try to impeach Hughes. Their testimony went nowhere,[9] and the district court eventually put a stop to it to avoid further waste of time. Ramey now assigns this ruling as error, and emphasizes the prejudice he suffered by the unrebutted molestation charge. The government quite naturally responds that Ramey was the author of his own predicament and should not be heard to complain now. He will not be. The district court's refusal to permit a wild goose chase into irrelevant and confusing evidence was not an abuse of discretion.

### VI.

■■■ The district court grouped three of the four offenses for sentencing.[10] The base offense level was the highest offense level of the convictions in the group. Using the 1989 Guidelines offense levels to avoid *ex post facto* problems, the court found that the highest offense level for a grouped offense was Count I, the civil rights conspiracy. This offense level is 2 plus the offense level for the underlying offense (arson). U.S.S.G. § 2H1.2(a)(2) (1989). Arson's offense level is 6 plus a specific offense characteristic. U.S.S.G. § 2K1.4 (1989). The district court chose an 18–level characteristic—where the arsonist "knowingly created a substantial

---

**8.** Turgeon did not move to strike the answer; instead, he busily went about impeaching it.

**9.** The police officer testified that he had taken statements from both Linda Hughes and Velma Hughes to the effect that Ramey had assaulted Velma, but that Ramey was never arrested on the charges. The case worker stated simply that his file showed that Velma Hughes had made the accusation. When Turgeon explained to the court that Margaret Ramey (the Hughes girls' mother and Ramey's ex-wife) had withdrawn the charges, the district court cut off further inquiry, because Margaret Ramey's actions did nothing to impeach her daughters' credibility.

**10.** The count for use of fire in the commission of a felony carries a 5–year mandatory consecutive sentence, and so was not grouped. See Part IX below.

risk of death or bodily injury." § 2K1.4(b)(1). The court thus arrived at base offense level 26 (2 + 6 + 18). The defendants argue that the level should have been only 20, because the court should have picked a 12–level specific offense characteristic—arson of a residence. § 2K1.4(b)(3). They say that the concept of a "residence" necessarily implies a risk of death or bodily injury. This assertion is not quite true. The arsonist may know that a dwelling is unoccupied when he burns it, or perhaps he might burn the residence in a manner that does not create a "substantial" risk of death or bodily injury. In any event, the arson guideline contemplates that its specific offense characteristics will often overlap, and provides that the one resulting in the highest offense level should apply. U.S.S.G. § 2K1.4(b) (1989). The district court found that it was a mere "fortuity" that neither Vance nor Nelms was seriously injured or killed in the fire. The district court did not err in fact or law.

## VII.

■ Some months after the fire, while he knew that he and Ramey were under investigation, Payne received a letter from Ramey. Payne destroyed it without opening it, because he believed that the letter was about the fire and that Ramey was trying to establish an alibi. The district court held that destruction of this potentially material evidence constituted an attempt to obstruct justice, and so enhanced Payne's offense level by two. U.S.S.G. § 3C1.1.[11]

On appeal, Payne contends that because Ramey did not testify about the contents of the letter and because he did not open it, the government failed to show that the letter was material to the investigation of the fire. If sentencing findings required death-and-taxes certitude, Payne would be right: Ramey could conceivably have written a friendly note expressing good cheer, or perhaps to impart a chocolate chip cookie recipe. Sentencing findings do not require such certitude. Payne's testimony admits that his *conscious purpose* was to destroy material evi-

dence—the hallmark of obstruction of justice. *See United States v. Romulus*, 949 F.2d 713, 717 (4th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1690, 118 L.Ed.2d 403 (1992). Even if he inadvertently destroyed an innocent off-season Valentine, he nevertheless deliberately *attempted* to obstruct justice. The district court correctly applied § 3C1.1, and its factual finding is not clearly erroneous.

## VIII.

■ While out on bond pending trial, Ramey was drinking beer with his lawyer's investigator, Doug Yanick. He grew belligerent, and he told Yanick that if he had to go to jail, "somebody should burn those niggers out and maybe burn the judge out too." Yanick reported the incident to Ramey's then-lawyer, Charles Phalen. When Phalen did not report the incident to authorities, Yanick did. As a result, District Judge Copenhaver recused himself, a new lawyer (Turgeon) was appointed for Ramey, and bond was revoked. At sentencing, because of these threats, Chief District Judge Haden gave Ramey a two-point enhancement for obstruction of justice. Ramey argues that the threats were idle, and points to his first lawyer's testimony at sentencing that he had not reported the remarks because he did not take them seriously. The district court reasoned that threats can succeed in obstructing justice if the threatened lend them any credence, notwithstanding that the threatener actually lacked the will or ability to carry them out. Here, the threats actually did obstruct justice by prompting the recusal of the district judge and the replacement of Ramey's counsel. As between the threatener and threatened, we think that the threatener should bear the risk of misunderstanding. The district court's finding is not clearly erroneous.

## IX.

■ Finally, the defendants received five years consecutive to their sentence on the grouped offenses for using fire in the com-

---

11. Application note 3 to this section includes, in a "non-exhaustive" list of examples of obstruction of justice, "destroying ... evidence that is material to an official investigation or judicial proceeding ..., or attempting to do so[.]"

mission of a felony. They argue that this sentence is improper, because 18 U.S.C. § 844(h)(1)'s consecutive sentence requirement applies only to uses of explosives, rather than fire. On the contrary, the statute provides that the sentence imposed under that section shall not be concurrent to "any other term of imprisonment." Though the statute continues, "including that imposed for the felony in which the explosive was used or carried," this language is plainly a mere illustration. Certainly its language of inclusion cannot be tortured into an *exclusion* of sentences for underlying fire-related felonies.[12]

The judgments are affirmed.

*AFFIRMED.*

MICHAEL, Circuit Judge, concurring in part and dissenting in part:

This is the meanest of cases, but I must dissent from Part II of the majority opinion, which affirms the convictions on the interstate arson count. I do not believe that living in a trailer up a remote hollow in Logan County, West Virginia, was ever meant to be an "activity affecting interstate or foreign commerce" under 18 U.S.C. § 844(i).

In this case, the issue is not so much the extent of Congress's power under the Commerce Clause as it is what Congress actually said in § 844(i). The majority was blinded by its assumption that the commerce power is "nearly boundless" (maj. op. at 606) and therefore failed to take a hard look at the statutory language.

Section 844(i) makes it a crime to "maliciously" set fire to "any building ... *used* ... in any *activity* affecting interstate ...

commerce ..." (emphasis added). The central question is: For what "activity" is the trailer "used"? In this case there is only one answer. The "activity" the trailer is "used" for is daily living. The trailer is an owner-occupied dwelling, nothing more, nothing less. I cannot find any case which says that the simple act of living in one's privately-owned dwelling is an activity affecting interstate commerce.

The majority sidesteps the real question by saying that the trailer is "used" in an "activity" that affects commerce because it consumes electricity from an interstate power grid. That reasoning twists the words of Congress too much. True, the trailer's occupants use electricity. But electricity consumption is not the "activity" for which the trailer is "used." Instead, the trailer is "used" only as a dwelling where its occupants carry out the general "activity" of daily living. Such a private use and activity should not be construed as affecting commerce.

Suppose in the next case under § 844(i) someone torches a trailer used as a hunting cabin that does not have electricity or any other public utility hookup. The activity there would only be recreational living. Yet under the majority's reasoning, the government could have a case. Food—like the electricity here—is consumed in the trailer placed deep in the West Virginia woods. In that trailer, the hunters might eat Spam from Omaha, Moon Pies from Chattanooga, and Corn Flakes from Battle Creek. These foods move in interstate commerce and eating them (in a trailer targeted for torching) would be as much an activity affecting commerce as consuming electricity in this case.

12. The defendants also attack their sentences on a variety of creative bases, none of which have any merit. They allude to double jeopardy (each of the offenses of conviction requires proof of an element that no other count does) and cruel and unusual punishment (compare *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991)). They complain that the prosecutors "manipulated" the indictment by taking advantage of the numerous different statutes prohibiting their conduct, which, true or not, is a beef they should take up with Congress. The defendants make no showing that the prosecutors framed the indictment as they did for any unconstitutional purpose. Finally, they offer the down-right weird theory that the conspiracy was complete when Ramey and Payne obtained the gasoline to set the fire (thus, we suppose, they used gasoline in the commission of arson, but not fire).

In addition to these sentencing "issues," defendants' brief teems with undeveloped, conclusory assertions of error, most of which are narrowed sub-attacks on the sufficiency of the evidence or challenges to certain rulings on the admission of evidence. Though we have considered and reject all of these arguments, we will not further clutter our already cluttered opinion with a pedantic "analysis" of them.

The majority opinion thus "would seem to stretch the notion of interstate commerce beyond the limits of logic." *United States v. Hansen,* 755 F.2d 629, 631 n. 4 (8th Cir.), *cert. denied,* 474 U.S. 834, 106 S.Ct. 105, 88 L.Ed.2d 85 (1985).

The Supreme Court and every circuit (except the Seventh and, today, ours) dealing with the issue has required at least some commercial tinge to the activity before holding that § 844(i) applies.

In *Russell v. United States,* 471 U.S. 858, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985), the Supreme Court recognized that if a residence had a second use, a use of commercial character, it could be the subject of an offense under § 844(i). Specifically, the Court held that the section applies to a two-unit apartment building used as rental property. The Court said that the rental of real estate is an activity that affects commerce, "recogniz[ing] that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties." *Id.* at 862, 105 S.Ct. at 2457. However, after reviewing the legislative history, the *Russell* Court could not have been clearer in saying that § 844(i) does not apply to all property:

> In the floor debates on the final bill, although it was recognized that the coverage of the bill was extremely broad, the Committee Chairman, Representative Celler, expressed the opinion that "the mere bombing of a private home even under this bill would not be covered because of the question whether the Congress would have the authority under the Constitution." In sum, the legislative history suggests that Congress at least intended to protect all business property, as well as some additional property that might fit that description, but perhaps not every private home.

By its terms, however, the statute only applies to property that is "used" in an "activity" that affects commerce....

*Id.* at 861–62, 105 S.Ct. at 2457.[1]

Under § 844(i), the targeted building, whether or not it is a private residence, must have "some relationship to an activity of commercial nature." *United States v. Andrini,* 685 F.2d 1094, 1095–96 (9th Cir.1982); *cf. United States v. Mayberry,* 896 F.2d 1117, 1120 (8th Cir.1990) ("the interstate nexus [under § 844(i) ] is not met without a showing that there is indeed *some interstate character* to the property involved") (emphasis added).

Some circuits have found the required link to interstate commerce because the targeted dwelling (1) was rented or was advertised for rent or sale, *see United States v. Turner,* 995 F.2d 1357 (6th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 282, 126 L.Ed.2d 232 (1993) (rented single family residence); *United States v. Parsons,* 993 F.2d 38 (4th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993) (same), or (2) was used in the resident's business, *see United States v. Shively,* 927 F.2d 804 (5th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 2806, 115 L.Ed.2d 979 (1991) (property owned and mortgage paid by resident's interstate trucking business, and used to put up truck drivers on layovers and to conduct business on weekends); *United States v. Barton,* 647 F.2d 224 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981) (illegal gambling club run in private home). *See also United States v. Voss,* 787 F.2d 393 (8th Cir.), *cert. denied,* 479 U.S. 888, 107 S.Ct. 286, 93 L.Ed.2d 261 (1986) (finding, in dicta, connection to interstate commerce in a vacant residence owned by real estate business, being rehabilitated for resale, and insured by interstate carrier). In all of these cases, the residential property had at least some connection to a commercial venture.[2]

---

1. Even if Congress has the power under the Commerce Clause to reach arson committed against an owner-occupied private home, it did not choose to exercise that power through the words of § 844(i). *See United States v. Ryan,* 9 F.3d 660, 676 (8th Cir.1993) (Arnold, J., dissenting), *vacated, reh'g en banc granted* (8th Cir. Jan. 5, 1994).

2. In *United States v. Ryan,* 9 F.3d 660, 666–67 (1993), the Eighth Circuit held that interstate

commerce was affected for the purposes of § 844(i) when a building housing a defunct "Fun and Fitness Center" was leased by the owner (and arsonist) to an out-of-state corporation. The fact that this commercial building was supplied by natural gas from out of state was cited as a further jurisdictional basis because "the receipt and use of natural gas from across state

Before today, this circuit had also consistently required at least some link to commercial activity before allowing § 844(i) to be invoked. In *United States v. Grossman*, 608 F.2d 534 (4th Cir.1979), the defendants blew up a backhoe. In affirming the convictions, we recognized the "statutory breadth" of § 844(i), but nonetheless carefully detailed the "sufficient interstate nexus" established by the evidence. The backhoe had been twice sold across state lines, it was financed and insured by interstate companies, and although not in commercial use at the time it was destroyed, it was being advertised nationally for sale in the trade publication, *Rock and Dirt. Id.* at 537. More recently, in *Parsons*, we held that a private home rented out for over two years, although vacant at the time it was torched (the owner having thoughtfully evicted her tenant before hiring an arsonist) was, under *Russell*, "used in an activity that affects interstate commerce...." 993 F.2d at 40.[3]

Two courts have expressly refused to extend § 844(i) to private residences. *See United States v. Mennuti*, 639 F.2d 107 (2d Cir.1981) (concluding that two private homes, one of which was a rental property, which were built with out-of-state materials, financed by interstate lending institutions, and supplied with interstate utilities were not "used" in an activity affecting commerce); *United States v. Montgomery*, 815 F.Supp. 7 (D.D.C.1993) (holding that a private home in the District of Columbia supplied by interstate utilities, employing a housekeeper from Virginia, and being used by its resident as a place to prepare the curriculum for a seminar she taught in Virginia was not within the ambit of § 844(i)).[4]

Judge Friendly's analysis in *Mennuti, supra,* explains why § 844(i) should not extend to an owner-occupied home that is strictly in private use:

To the ordinary mind, the destruction of two private dwellings would not constitute the destruction of buildings *used* in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. The pictures summoned up by these words include such things as railroad stations, bus depots, airport buildings, and factories using raw materials from out of state or shipping products out of the state[.] Crossing the area between use in commerce and use affecting commerce, we reach such buildings as the offices of an insurance company receiving premiums from outside the state and disbursing benefits and loans across state lines, or of a company delivering within the state oil purchased from another company that had brought it into the state, or hotels and restaurants serving imported food to persons traveling from one state to another.

[A] residence is not used in interstate or foreign commerce simply because ... it received electric power and telephone service from companies engaged in or affecting commerce....

639 F.2d at 109–10 (citations omitted).[5]

The better reasoned decisions such as *Mennuti* allow only one conclusion in this case. A trailer does not have "interstate character" or affect commerce because its

---

borders is an activity directly affecting interstate commerce." *Id.* However, the court explicitly "refuse[d] to extend the decision, as did the Seventh Circuit [in *United States v. Stillwell, see infra* note 4], to property which is purely private in nature, such as a privately owned home, used solely for residential purposes." *Id.* at 667.

**3.** In *Parsons*, we were careful to "express no opinion on the circumstances required to bring a private residence that is not 'rental property' within the statute." *Id.* at 40 n. 3. That care is thrown to the winds today.

**4.** *United States v. Stillwell*, 900 F.2d 1104 (7th Cir.), *cert. denied*, 498 U.S. 838, 111 S.Ct. 111,

112 L.Ed.2d 81 (1990), is the only case I have found which holds that a private home's use of an interstate utility (gas) was enough to trigger § 844(i). The *Stillwell* court admitted that its construction was "an extension of § 844(i)[.]" *Id.* at 1111. The extension is simply unsupportable because it goes beyond the plain scope of the statutory language.

**5.** Judge Friendly's conclusion in *Mennuti* that advertising a home for rental would not trigger § 844(i) must be discounted in light of *Russell*, which came later. However, the above quote from him still makes good sense and is consistent with *Russell* 's message that some use of a commercial character is required.

occupants use electricity in the routine non-commercial activities of daily life.

Torching the residence of an interracial couple is the most despicable of acts. Nevertheless, I respectfully dissent from Part II of the majority opinion because the trailer's use here does not provide a jurisdictional basis for prosecuting the defendants under 18 U.S.C. § 844(i). I do concur in all other aspects of the majority opinion (including parts III through VII) that affirm defendants' convictions and sentences for depriving the victims of their civil rights, willfully interfering with fair housing rights, and using fire in the commission of a felony.